# United States Court of Appeals
## For the First Circuit

No. 15-1803

GREGORY GARMON, SR.,

Plaintiff, Appellant,

v.

NATIONAL RAILROAD PASSENGER CORPORATION d/b/a AMTRAK,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. Mary M. Lisi, U.S. District Judge]

Before

Lynch, Thompson, and Barron,
Circuit Judges.

Christopher J. Trombetta, with whom Law Office of Christopher
J. Trombetta was on brief, for appellant.
Lisa Stephanian Burton, with whom Peter J. Mee, Thomas J.
McAndrew and Morgan Lewis & Bockius LLP were on brief, for
appellee.

December 16, 2016

**THOMPSON**, **Circuit Judge**. In this employment discrimination case, appellant Gregory Garmon, Sr., an African-American man currently employed by Amtrak, alleges that his opportunities for overtime were reduced because of his race and that he was subjected to a hostile work environment in violation of 42 U.S.C. § 1981. The district court granted Amtrak's motion for summary judgment and this appeal followed. After careful consideration, we affirm the district court's ruling.

### Background

Gregory Garmon, Sr., has been employed with Amtrak since 1997 when he first began working for the company as a signal helper. In 2001 he was promoted to his current position as a lineman in the Electric Traction Department where his responsibilities include, among other things, construction, installation, and repairs of the overhead catenary system. In addition to linemen, Amtrak also employs high rail operators ("HROs") and foremen. HROs perform all the duties of linemen, but also operate high rail equipment on the railroad.

From 2003 through February 2015, Amtrak organized its Electric Traction Department into three shifts. The first shift ran from 6:00 am to 2:00 pm, Monday through Friday, and initially consisted of Garmon, the sole lineman, and two white co-workers, Christopher Alves and William Butler, both HROs. In 2008, James Thackaberry, another white co-worker, was added to the first shift

as a foreman. Throughout his employment, Garmon admits he was never interested in seeking a promotion to work as either a foreman or HRO. Indeed, Garmon stated that he "had no[] desire[]" to work as an HRO and accordingly, he currently still works as a lineman in Amtrak's Boston/Providence cost center.[1]

Garmon's employment with Amtrak is governed by a collective bargaining agreement (the "CBA") negotiated between the International Brotherhood of Electrical Workers ("IBEW") and Amtrak. Despite Garmon's unsubstantiated assertions to the contrary, Rule 13 of the CBA explicitly governs the distribution of overtime for Amtrak's IBEW employees. Rule 13 provides, in pertinent part, that "[o]vertime [is] to be distributed in conjunction with the duly authorized local committee of the craft or their representative and local management." The CBA also provides a procedure for IBEW employees to file grievances within 60 days from the date of the occurrence on which their claims are based. Garmon never filed a grievance with the IBEW regarding his overtime discrimination or hostile work environment claims.[2]

_____

[1] Amtrak divides its Electric Traction Departments by geographical regions, called "cost centers." Electric Traction Department employees who work out of either Boston, Massachusetts, or Providence, Rhode Island, are organized under the same cost center -- fittingly designated the "Boston/Providence" cost center.

[2] Garmon never filed a grievance, in spite of the fact that Amtrak maintains an Anti-Discrimination and Anti-Harassment Policy, as well as an Equal Employment Opportunity/Affirmative Action Policy and provides its employees with a Dispute Resolution

Garmon did complain to a division engineer, George Fitter, about the distribution of overtime in 2012, but Fitter concluded that the overtime policy was being administered correctly.[3]

In accordance with the CBA, Amtrak overtime needs are first determined by Amtrak management and then communicated to a local union representative, who eventually manages the distribution of overtime amongst IBEW employees. Since February 2011, Michael Poole, who has served as the Assistant Division Engineer at Amtrak, has been responsible for determining overtime needs and seeking budgetary approval from Amtrak's senior management for proposed overtime. Alves, Garmon's co-worker on the first shift, is also a member of the IBEW and served as the union representative who oversaw the overtime sign-up process from 2009 to 2013.

---

Office to resolve complaints and enforce its Anti-Discrimination policies.

[3] Garmon's reliance on Jenkins v. United Airlines, CIVIL ACTION NO. 93-10092-RWZ, 1995 U.S. Dist. LEXIS 14902 (D. Mass. July 31, 1995) for his argument that the CBA has no relevance to his claims because "racial discrimination claims are not subject to any grievance procedure" is misplaced. In Jenkins, the court found that an arbitration provision in the CBA did not strip the court of jurisdiction over the plaintiff's Title VII race discrimination claims. The court noted that statutory civil rights claims were not subject to arbitration under the grievance procedures of the CBA clause. None of the Jenkins facts or issues are applicable to Garmon's case. Nevertheless, because our ruling here is not contingent on Garmon's failure to follow CBA grievance procedures, his argument is inapposite.

Before Poole was hired as the Assistant Division Engineer, overtime needs were determined by Amtrak management and verbally communicated to Alves, who would then create a written sheet based on the verbal suggestions of an Amtrak supervisor. After Poole was hired, the process was no longer verbal and an Amtrak supervisor would create and submit written sign-up sheets to Alves which identified the specific positions and shifts needed for overtime by role. Alves was then responsible for overseeing the overtime sign-up process and would return the filled-out sheets to Amtrak management.

It is this process of determining Amtrak overtime needs by Poole and Amtrak management that Garmon seems to take issue with. Garmon alleges that his supervisor, Greg Brennan, instituted an overtime plan in the fall of 2012, whereby Amtrak discriminated in its determination of overtime needs in order to afford white employees more overtime opportunities than African-American employees. According to Garmon, under the previous overtime plan, and prior to Thackaberry's new first shift assignment, he would essentially take turns opting for overtime hours with the two other first shift employees -- Alves and Butler. Garmon argues that Amtrak's overtime system prior to 2012 did not distribute overtime hours based on position or role and thus he had more opportunities for overtime. Garmon also alleges that once Thackaberry -- a foreman -- was added to his shift he was required to share overtime

- 5 -

opportunities with Thackaberry, while Alves and Butler -- HROs -- were not required to do the same.

In addition to his complaints about overtime denials, Garmon says that he was also subjected to a hostile work environment. He presents a list of workplace gripes: (1) he was denied access to the equipment canister keys; (2) he was not sufficiently trained regarding Structural Erection Diagrams ("SEDs"); (3) he was not appropriately acknowledged by his supervisors or other co-workers; (4) he was intimidated while at work; and (5) he was put in difficult situations in the hopes that he would fail. Amtrak denies all. First, it says that there was never a change in its overtime policy. Second, Amtrak adamantly denies that Garmon was ever subjected to a hostile work environment.

Concluding that Garmon failed to proffer any evidence that he suffered an adverse employment action or that he was subjected to a hostile work environment, the district court granted Amtrak's motion for summary judgment. Garmon subsequently filed this timely appeal.

## Discussion

"We review the district court's grant of summary judgment de novo, viewing the facts in the light most favorable to the non-moving party." Rodriguez-Cuervos v. Wal-Mart Stores, Inc., 181 F.3d 15, 19 (1st Cir. 1999). Nevertheless, "[a]lthough

- 6 -

we will draw all reasonable inferences in the nonmovant's favor, we will not 'draw unreasonable inferences or credit bald assertions, empty conclusions, rank conjecture, or vitriolic invective.'" Pina v. Children's Place, 740 F.3d 785, 795 (1st Cir. 2014) (quoting Cabán Hernández v. Philip Morris USA, Inc., 486 F.3d 1, 8 (1st Cir. 2007)). "[A] party cannot successfully oppose a motion for summary judgment by resting 'upon mere allegations or denials of his pleading.'" Pina, 740 F.3d at 795 (quoting LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993)). Rather, "a plaintiff's ability to survive summary judgment depends on his ability to muster facts sufficient to support an inference of discrimination." Bennett v. Saint-Gobain Corp., 507 F.3d 23, 30 (1st Cir. 2007). Therefore, "a nonmovant cannot rely 'merely upon conclusory allegations, improbable inferences, and unsupported speculation.'" Pina, 740 F.3d at 795 (quoting Dennis v. Osram Sylvania, Inc., 549 F.3d 851, 855–56 (1st Cir. 2008)).

"A plaintiff claiming employment discrimination based upon race [may] assert a claim for a racially hostile work environment, in addition to the classic claim of so-called 'disparate treatment.'" Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 767–68 (1998). Here, Garmon alleges that Amtrak subjected him to both disparate treatment and to a hostile work environment because of his race. With regard to both claims, the

parties dispute whether Garmon has sufficiently made a prima facie showing.  We discuss each argument seriatim.

## 1. Disparate Treatment

Where, as here, there is no direct evidence of discrimination, Garmon must rely on the three-stage burden-shifting framework outlined in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  Under McDonnell, Garmon bears the initial burden of establishing a prima facie case that gives rise to an inference of discrimination.  Id.; Kosereis v. Rhode Island, 331 F.3d 207, 212 (1st Cir. 2003).  To establish a prima facie case Garmon must show by a preponderance of the evidence that: "(1) [he is] a member of a protected class; (2) [he is] qualified for [his] job; (3) [he] suffer[ed] an adverse employment action at the hands of [his] employer; and (4) [there is] some evidence of a causal connection between [his] membership in a protected class and the adverse employment action."  Bhatti v. Trs. of Bos. Univ., 659 F.3d 64, 70 (1st Cir. 2011).  "While the burden of establishing a prima facie case is 'not onerous,' the plaintiff is still required to prove the prima facie elements by a 'preponderance of the evidence.'"  Del Valle-Santana v. Servicios Legales de P.R., Inc., 804 F.3d 127, 131 (1st Cir. 2015) (quoting Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981).  Admittedly, "[t]he burden of showing something by a 'preponderance of the evidence,' . . . 'simply requires the trier of fact to believe

that the existence of a fact is more probable than its nonexistence.'" Concrete Pipe & Prod. of California, Inc. v. Constr. Laborers Pension Trust for S. California, 508 U.S. 602, 622 (1993) (citations omitted). However, throughout the McDonnell burden-shifting analysis Garmon maintains the ultimate burden of persuasion. Woodman v. Haemonetics Corp., 51 F.3d 1087, 1092 (1st Cir. 1995).

If able to make such a showing, Garmon creates a rebuttable presumption that Amtrak engaged in discrimination. Amtrak may rebut this presumption by pointing to evidence of a legitimate, non-discriminatory reason for the challenged conduct. Id. If Amtrak is able to make such a showing, the presumption of discrimination disappears and the burden of production again shifts to Garmon, who must offer evidence that Amtrak's explanation is pretextual and that discriminatory animus prompted the adverse action. The parties dispute whether Garmon has met his initial burden of establishing a prima facie case. Specifically, the parties dispute whether Garmon can establish that he suffered an adverse employment action or that a causal connection exists between the alleged action and his race.

**a) Adverse Action**

The parties first dispute whether Garmon can establish that he suffered an adverse employment action. Garmon argues that under an alleged new overtime policy instituted by Amtrak in 2012,

he "suffered adverse employment events through the denial of overtime opportunities" and "the associated loss of income." Amtrak responds that it never instituted a new overtime policy. According to Amtrak, employees are given the opportunity to sign up for overtime based on their respective shifts, positions, and locations. The process, it says, affords first-shift employees preference over first-shift overtime slots if they are qualified for the position or role that needs to be filled. If all qualified employees on the first shift decline an overtime opportunity, other Electric Traction employees are then allowed to fill the overtime slot depending on their positions, qualifications, and location. Amtrak asserts that Garmon was never subjected to a reduction in his overtime opportunities under any overtime policy change and that any alleged reduction in overtime does not amount to an adverse employment action because his overtime hours exceeded those of two white, first-shift co-workers.

"An adverse employment action 'typically involves discrete changes in the terms of employment, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits.'" Cham v. Station Operators, Inc., 685 F.3d 87, 94 (1st Cir. 2012) (quoting Morales-Vallellanes v. Potter, 605 F.3d 27, 35 (1st Cir. 2010)). While we have not explicitly addressed whether a loss in overtime opportunities constitutes an

adverse employment action within the § 1981 context, it seems foreseeable that, at least in some contexts, decreased overtime opportunities could cause a "material" change in the conditions of a plaintiff's employment. See Gu v. Boston Police Dept., 312 F.3d 6, 14 (2002). To determine whether an action is materially adverse, we must engage in an objective, "case-by-case inquiry," recognizing that "[w]ork places are rarely idyllic retreats, and the mere fact that an employee is displeased by an employer's act or omission does not elevate that act or omission to the level of a materially adverse employment action." Blackie v. Maine, 75 F.3d 716, 725 (1st Cir. 1996). "A materially adverse change in the terms and conditions of employment 'must be more disruptive than a mere inconvenience or an alteration of job responsibilities.'" Morales-Vallellanes, 605 F.3d at 35 (quoting Marrero v. Goya of P.R., 304 F.3d 7, 23 (1st Cir. 2002)).

As for Garmon's claim that he was subjected to an adverse employment action via a discriminatory overtime plan instituted by Brennan in 2012, the record contains no evidence of such a discriminatory plan or an actual decrease in Garmon's overtime opportunities outside of his bare allegations to the contrary. Accordingly, Garmon fails to meet his ultimate burden of persuasion here.

A review of the record reveals that Amtrak's overtime was determined and distributed according to the CBA, which governs

"the rates of pay, hours, rules, and working conditions" of Amtrak's electrical workers. Pursuant to Rule 13 of the CBA, "overtime [is] to be distributed in conjunction with the duly authorized local committee of the craft or their representative and the local management. Record will be kept of overtime worked and men called with the purpose in view of distributing the overtime equally." To that end, Poole, a supervisor at Amtrak, first determined Amtrak's overtime needs by considering multiple factors including "weather conditions, overall operational budgeting, and any special projects or details that would require additional manpower from the Electric Traction Department."[4] After that, Poole (or someone else from Amtrak's management) would inform Alves, IBEW's representative for overtime distribution among members from 2009 to 2013, of Amtrak's overtime needs. Alves would then take the needs identified by Amtrak management and distribute overtime amongst IBEW employees in accordance with this collaborative process. And despite Garmon's contentions to the contrary, there is no evidence in the record that this general overtime policy ever changed.

---

[4] Garmon contends that Poole never took into account these factors in determining overtime needs and argues that his supervisor, Gregory Brennan, made suggestions to Poole as to overtime needs in order to "preserve[] the overtime opportunities existing on the first shift for the white workers." Garmon relies on conclusory statements contained in his affidavit in support of his contentions, which only mirror the allegations of his complaint without any further factual support.

- 12 -

The only evidence proffered by Garmon in support of his contentions is his own affidavit, which in large part contains unsupported, speculative assertions about the way overtime was determined and administered at Amtrak. Garmon's unsupported assertions, however, are insufficient to present a material issue of fact meriting trial. We have repeatedly held that "[t]o the extent that affidavits submitted in opposition to a motion for summary judgment merely reiterate allegations made in the complaint, without providing specific factual information made on the basis of personal knowledge, they are insufficient." Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 53 (1st Cir. 2000); see also Velazquez-Garcia v. Horizon Lines of P.R., Inc., 473 F.3d 11, 15 (1st Cir. 2007) (noting that "[n]either wishful thinking . . . nor conclusory responses unsupported by evidence will serve to defeat a properly focused Rule 56 motion") (quoting Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990)); López-Carrasquillo v. Rubianes, 230 F.3d 409, 414 (1st Cir. 2000) (finding that where an "assertion merely repeats the conclusory allegations in the complaint," it is insufficient because "affidavits submitted in opposition for summary judgment must be based on the affiant's personal knowledge").

To be clear, a party's affidavit may be self-serving and yet, still present genuine issues of fact if it contains relevant information of which the party has first-hand knowledge. Santiago-

- 13 -

Ramos, 217 F.3d at 53.  Here, however, Garmon's affidavit in large part fails to meet this basic requirement as he avers facts beyond the scope of his personal knowledge.  For instance, Garmon seems to take issue specifically with the internal process by which Amtrak management determined its overtime needs, including its specific position staffing needs, before communicating those needs to the IBEW representative for distribution.  However, he lacks any personal knowledge of Amtrak's decision making process or the policies which governed its determination of overtime needs.

Perhaps the only fact which Garmon avers, of which he may have personal knowledge, is his bare allegation that his "overtime opportunities became reduced by at least one-third."[5] However, Garmon proffers no evidence of an actual reduction in his overtime opportunities outside of this assertion and his own say-so.  This is insufficient to meet his burden of establishing a prima facie case.  See Medina-Rivera v. MVM, Inc., 713 F.3d 132, 139 (1st Cir. 2013) (holding that where a defendant relied "on her say-so" and did "not support her rhetoric with hard proof," "her severe-work-reduction [retaliation] charge amount[ed] to no more

_____

[5] While Amtrak argues (and the record reflects) that between 2009 and 2013 Garmon worked more overtime hours than two of his three, white peers on the first shift, this fact does not by itself tell us one way or another whether Garmon's opportunities for overtime were somehow reduced.  That being said, Garmon presents no evidence in support of his claim that he suffered lost overtime opportunities because of his race outside of his unsupported statements.

than conclusory speculation, which cannot block summary judgment" or establish a prima facie case).

In support of his claim, Garmon provides no evidence of the exact amount of overtime opportunities available to him prior to the initiation of the alleged discriminatory policy, no evidence of the amount of overtime shifts available to him after the alleged policy was initiated, no evidence of an increase in overtime for his first-shift, white co-workers (Alves and Butler), nor -- as the district court noted -- any evidence that he ever sought and was denied any overtime lineman opportunities that he requested. In fact, even the most generous reading of his brief leaves numerous questions about the nature of his alleged reduction in overtime opportunities unanswered. Outside of Garmon's statement that his overtime opportunities were reduced, the only evidence concerning overtime opportunities demonstrates that despite Garmon's contentions that he was denied overall overtime opportunities, he admits that he chose not to work certain overtime hours, including overtime that fell on Sundays. Thus, it would seem that Garmon's real complaint may not be that his overtime hours were reduced, but that he was not afforded overtime hours on the days he preferred. And while Garmon alleges that his direct supervisor, Brennan, initiated the alleged discriminatory overtime plan in 2012 to give white co-workers as much overtime as possible, Garmon again proffers no evidence in support of his contentions

outside of his self-serving affidavit and bald assertions. Santiago-Ramos, 217 F.3d at 53; López-Carrasquillo, 230 F.3d at 414; Jakobiec v. Merrill Lynch Life Ins. Co., 711 F.3d 217, 226 (1st Cir. 2013) ("[T]he summary judgment stage is the put up or shut up moment in litigation.") (citations omitted). While not an onerous standard, a prima facie showing requires more than mere bald assertions, unsupported by anything beyond personal say-so.

### b) Causal Connection

Even if we were to assume that Garmon did suffer a materially adverse action in the form of a discriminatory overtime policy, Garmon fails to demonstrate a causal connection between his membership in a protected class and the adverse action alleged. Outside of the bare allegations in his complaint and his unsupported affidavit, Garmon presents absolutely no evidence that Amtrak decided to designate overtime needs by role, not for legitimate business purposes, but rather, in order to discriminate against him or other workers because of their race. To the contrary, the record demonstrates that at least one third-shift African-American HRO employee was able to select and work first-shift overtime hours that he qualified for. This fact weighs against Garmon's contention that Amtrak sought to make more first-shift overtime available to white employees at the expense of African-American employees. See Johnson v. Walgreen, Nos. 92-1084, 92-1085, 1992 WL 357828, at *5 (1st Cir. Dec. 7, 1992)

- 16 -

(unpublished) ("the fact that the [appellees] had hired other black pharmacists suggests that the failure to interview or hire [the appellant] was for objective reasons . . . . Without 'some meaningful, fact-specific . . . causal link' upon which a permissible inference of race-based discrimination could be premised . . . [the appellant] has failed to make out a cognizable § 1981 claim.") (quoting Dartmouth Review v. Dartmouth Coll., 889 F.2d 13 (1st Cir. 1989) (overruled on other grounds by Educadores Puertorriquenos en Accion v. Hernandez, 367 F.3d 61 (1st Cir. 2004)). And Garmon lacks personal knowledge to support his allegations that the actual work required of employees working particular overtime hours in the aftermath of the alleged discriminatory policy did not require certain qualifications indicated by designation (HRO, linemen, or foremen).[6] Garmon fails

---

[6] We also note that even if Garmon were to make out a prima facie case and sufficiently show a causal connection, his claim would ultimately fail at the third step of the McDonnell analysis, which requires him to provide evidence that Amtrak's explanation for his alleged reduction in overtime opportunities is pretextual and that discriminatory animus prompted the adverse action. At this stage of the litigation, discovery is complete, the record and evidence that would appear at trial set. However, most of Garmon's proffered evidence of disparate treatment consists of his own personal observations which led him to believe that he was the target of illegal discrimination. But his "subjective speculation and suspicion" that he was treated unfairly because of his race is insufficient to establish a disparate treatment claim or that HROs, linemen, and foremen were all similarly-situated for purposes of overtime duties and work. See Mariani-Colon v. Dep't of Homeland Sec., 511 F.3d 216, 222 (1st Cir. 2007). Therefore, even if Garmon were to make a sufficient prima facie showing of this fourth element, he would

to meet his initial burden of establishing a prima facie case of disparate treatment discrimination.[7]

## 2. Hostile Work Environment

Garmon also alleges that he was subjected to a hostile work environment and as such the district court erred in rejecting his discrimination claim.  To establish a hostile work environment, Garmon is required to "show that his work environment was so pervaded by racial harassment as to alter the terms and conditions of his employment."  Burlington, 524 U.S. at 768.  To make a prima facie showing Garmon must demonstrate:

> (1) that [he] is a member of a protected class; (2) that [he] was subjected to unwelcome [racial] harassment; (3) that the harassment was based upon [race]; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of [his] employment and create an abusive work environment; (5) that [racially] objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) that some basis for employer liability has been established.

---

ultimately fail at the pretextual analysis later required under McDonnell.

[7] In February 2015, Amtrak decreased the total number of shifts for the Electric Traction Department from three to two. Throughout his responses to Amtrak's Rule 56 Statement and his brief, Garmon appears to argue that Amtrak has changed the 2012 discriminatory overtime policy since the filing of his suit and that the changes implemented in 2015 ended Amtrak's alleged discriminatory practices.  Because Garmon fails to provide any evidence that a 2012 discriminatory policy was ever implemented and does not claim that the purported 2015 change resulted in any discriminatory actions against him, the alleged 2015 change in Amtrak shift scheduling is inapposite.

Douglas v. J.C. Penney Co., 474 F.3d 10, 15 (1st Cir. 2007) (citing O'Rourke v. City of Providence, 235 F.3d 713, 728 (1st Cir. 2001)); cf. Prescott v. Higgins, 538 F.3d 32, 42 (1st Cir. 2008).

In support of his hostile work environment claim, Garmon alleges that Amtrak subjected him to a variety of hostile conditions including: (1) failing to provide him keys to the equipment canister; (2) denying him adequate training on SEDs, and thus, relegating him to a subordinate role in relation to less experienced, white co-workers; (3) reducing his overtime opportunities; (4) subjecting him to intimidation; and (5) placing him in difficult positions in an attempt to have him make an error and receive discipline. Garmon also argues that in 2001 Amtrak assigned him to the night shift and only changed him back to the day shift after he complained that he had been moved to the night shift because of his race. Garmon also alleges that his supervisors and other co-workers failed to appropriately acknowledge him on multiple occasions. We need not address the minutiae of each claim[8] because even if Garmon's complaints rise

---

[8] Nor need we rest our decision on the statute of limitations impediments which the district court pointed out in its decision. Section 1981 discrimination claims are subject to a four-year statute of limitations. See Buntin v. City of Bos., 813 F.3d 401, 404–05 (1st Cir. 2015) (citing Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 382 (2004)). And hostile work environment claims may be pursued under Section 1981 (as well as Title VII). See Danco, Inc. v. Wal-Mart Stores, Inc., 178 F.3d 8, 13 (1st Cir. 1999). Here, Garmon's Section 1981 discrimination claims accrue "when the alleged unlawful act 'has a crystallized

to the level of a hostile work environment,[9] Garmon has not demonstrated that he was subjected to any of the complained of actions because of his race. Here, Garmon proffers no evidence that any of the above-mentioned actions were race related outside of his unsubstantiated assertions that the actions had to be the product of discriminatory animus. This is insufficient to create a material issue of fact or merit trial. See Jakobiec, 711 F.3d at 226 ("A plaintiff's failure to produce any evidentiary proof concerning one of the essential elements of his claim is grounds for summary judgment.").

## CONCLUSION

For the foregoing reasons, we affirm the district court's ruling granting Amtrak's motion for summary judgment with each party to bear their own costs.

---

and tangible effect on [him] and [he] has notice of both the act and its invidious etiology.'" Buntin, 813 F.3d at 405 (quoting Shervin v. Partners Healthcare Sys., Inc., 804 F.3d 23, 33 (1st Cir. 2015)). Because Garmon filed suit on July 11, 2013, the district court observed that all of his hostile work environment claims would have had to have taken place on, or after, July 11, 2009 to remain viable. Because the record demonstrates that all of the complained of acts occurred before 2008, the district court opined that Garmon's hostile work environment claims were precluded by the applicable four-year statute of limitations.

[9] However, we remind the reader that "federal employment discrimination laws do not establish 'a general civility code' for the workplace." Quiles-Quiles v. Henderson, 439 F.3d 1, 7–8 (1st Cir. 2006) (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998)).