# United States Court of Appeals
## For the First Circuit

No. 16-2304

DEBRA CHERKAOUI,

Plaintiff, Appellant,

v.

CITY OF QUINCY,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Leo T. Sorokin, U.S. District Judge]

Before

Torruella, Lynch, and Lipez,
Circuit Judges.

Marisa A. Campagna and Law Office of Marisa A. Campagna on brief, for appellant.
Sarah A. Catignani, Brandon H. Moss and Murphy, Hesse, Toomey & Lehane, LLP on brief, for appellee.

December 4, 2017

TORRUELLA, **Circuit Judge**.  Debra Cherkaoui ("Cherkaoui" or "Plaintiff") appeals from the district court's grant of summary judgment in favor of her former employer, the City of Quincy, Massachusetts ("City" or "Defendant"), on her claims of employment discrimination, retaliation, and constructive discharge.  She argues that the district court erred by adopting the magistrate judge's Report and Recommendation and granting the City's motion for summary judgment.  After careful consideration, we find no such error, and thus affirm.

## I.  Background

Because this is an appeal from a grant of summary judgment, "we review the facts in a manner as favorable to [the plaintiff] as the record allows, 'keenly aware that we cannot accept conclusory allegations, improbable inferences, and unsupported speculation.'"  Pina v. Children's Place, 740 F.3d 785, 788 (1st Cir. 2014) (quoting Medina-Rivera v. MVM, Inc., 713 F.3d 132, 134 (1st Cir. 2013)).

### A.  Factual History

Cherkaoui was hired by the City as a Spanish teacher in 1998.  For approximately eleven years, except for a brief period when her child was born and the 2001-2002 school year when she worked as a full-time Spanish teacher at Sterling Middle School ("Sterling"), Cherkaoui worked part-time at Atlantic Middle School

-2-

("Atlantic"). She originally only taught Spanish, but later transitioned to the English Language Learners ("ELL") department. Prior to 2009, Cherkaoui had not been subject to any disciplinary action.

Plaintiff converted to Islam in 1998. In April 2009, she began wearing a headscarf to work for religious reasons. It is from that point forward, Cherkaoui alleges, that she was subjected to "hostile treatment" by the Defendant. This alleged "hostile treatment" consisted of: 1) several events of discourteous and differential treatment as compared to other similarly situated teachers; 2) inappropriate or impractical assignments; 3) and failure by Defendant to properly respond to her grievances. In addition, Cherkaoui suffers from Attention Deficit Hyperactivity Disorder ("ADHD"), known to the employer, and further alleges that the City did not adequately respond to her requests for reasonable accommodations. We review each of the alleged discriminatory incidents by academic year.

### 1. 2009-2010 Academic Year

#### a. Different Treatment as Compared to Similarly Situated Teachers

During the spring of 2009, Cherkaoui requested a full-time teaching assignment for the following school year. She indicated that her first preference was for an assignment in Atlantic, but that she was open to the possibility of a split

assignment with another school. The City granted Cherkaoui's request, offering her the only full-time teaching position available: a split assignment between Atlantic and Sterling. Cherkaoui accepted the split assignment. This was to be her first time teaching classes at two different schools. According to Plaintiff, having teachers split their time between two schools is a disfavored practice in the Quincy Public Schools ("QPS") system.

In June 2009, Cherkaoui received the details of her assignment for the 2009-2010 academic year, consisting of three ELL classes at Atlantic and two at Sterling. However, just a few days before the school year started, the City informed Plaintiff that her teaching assignment in Atlantic would instead consist of two ELL classes and one Spanish class. The Sterling teaching assignment remained unchanged. Plaintiff claims that this last minute reassignment was disadvantageous for her because she had not taught Spanish for many years. She also asserts that it is "extraordinary" for teachers to receive their final assignments so close to the new school year. Cherkaoui objected to this last minute change. Nevertheless, she began teaching her split assignment for the school year.

By the time the school year started, Cherkaoui had still not been assigned a classroom at Sterling. Sterling's principal, Christine Barrett ("Principal Barrett"), had instead offered her

a section of the school's library known as the media center.  The media center lacked a desk and a place for her to securely store her materials.  Principal Barrett then offered Plaintiff another classroom typically used by the special education teacher.

### b. Tardiness

Cherkaoui alleges that between her assignments at Atlantic and Sterling, she was not afforded sufficient time for travel, preparation, and lunch, as the Teacher's Union contract required.  Because of this, Plaintiff was late to her teaching assignment at Sterling on several occasions and received oral reprimands, three written warnings, and ultimately a suspension.  On September 30, 2009, Cherkaoui complained about the insufficiency of her allotted time to travel between schools, and met with QPS officials to discuss this alleged violation of her Union contract.  From then on, Defendant gave Cherkaoui an additional ten minutes to travel between Atlantic and Sterling.

Despite this adjustment, Cherkaoui was again late on October 7.  On November 17, 2009, Principal Barrett sent her a written warning.  That same day, Cherkaoui met with Principal Barrett to discuss her tardiness.  The parties' recollection of this meeting differ.  Plaintiff alleges she asked Principal Barrett if she was being treated in a hostile manner because she wore a headscarf.  The City, however, contends that Plaintiff

exhibited inappropriate and hostile behavior towards Principal Barrett during the meeting.

Principal Barrett issued Plaintiff a second written warning on November 18, 2009, referencing Cherkaoui's tardiness issues and alleged inappropriate conduct during their meeting the day before. Cherkaoui denies being late on all the referenced dates in the warning letters. On December 3, 2009, Principal Barrett sent Cherkaoui a third written warning due to her tardiness earlier that week. On that same day, after unsuccessfully attempting to discuss this warning letter with Principal Barrett, Cherkaoui left Sterling and met briefly with Superintendent Richard DeCristofaro ("DeCristofaro"). Plaintiff went home after that meeting, taking a half-day on sick leave.

On December 22, 2009, DeCristofaro issued Plaintiff a Notice of Intent to Suspend for "tardiness and inappropriate conduct." Plaintiff was offered the opportunity to request a meeting to review and discuss the contemplated suspension. Plaintiff requested such a meeting; however, she failed to attend it and did not return to work after December 22, 2009. The next day, Cherkaoui sent an email to the Director of Human Resources, Kevin Mulvey ("Mulvey"), disclosing to the City for the first time that she suffered from ADHD, and requesting reasonable

-6-

accommodations under the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101-12213.

On January 7, 2010, the City sent Cherkaoui a letter suspending her for three days due to her "consistent tardiness and inappropriate conduct that ha[d] occurred throughout the school year."  On January 9, 2010, Cherkaoui filed a discrimination charge with the Equal Employment Opportunity Commission ("EEOC"), alleging religious discrimination and retaliation.

### c. Independent Medical Examiner

Under the Union contract, once a QPS employee has used up her accumulated sick leave, she may avail herself of extended paid sick leave.  Once an employee requests this benefit, the City may request from the employee any form of evidence of the employee's disability, including an independent medical exam ("IME").  Cherkaoui did not return to work after the suspension for the rest of the 2009-2010 academic year due to her ADHD, exhausting her accumulated sick leave.  While on sick leave, Cherkaoui learned through her Union president that she could apply for extended sick leave.  The Union president also explained that the City could request an IME as part of her application. Ultimately, Cherkaoui sought access to the extended sick leave benefit and the City exercised its right to have her undergo an IME to substantiate her leave application.  After Plaintiff

-7-

underwent the IME and was deemed unable to return to work, she was awarded extended sick leave benefits. Cherkaoui then amended her EEOC charge to include the City's request for an IME as an additional instance of retaliation.

## 2. 2010-2011 Academic Year

Over the summer of 2010, Cherkaoui notified Defendant that she would be able to return to work for the upcoming 2010-2011 school year. In anticipation of her return, on June 28, 2010, she sent Mulvey a written request for reasonable accommodations for her diagnosed ADHD. Cherkaoui requested: (1) that her teaching assignments be limited to one school; (2) that she receive the names and contents of the assigned courses one month before the start of the school year; (3) that she receive an opportunity to have a meeting with her supervisor before the start of the school year to establish clear lines of communications; and (4) that she be notified 24 hours in advance of any meetings other than those that all teachers are required to attend.

Defendant granted all of Cherkaoui's requests except for the 24-hour advance notice for meetings because, according to Defendant, this was not possible. Starting in the 2010-2011 school year, Cherkaoui became a full-time ELL teacher at Atlantic. The rest of the school year seemed incident-free, except for three events highlighted by Plaintiff. First, the City requested

Plaintiff to submit to another IME before she would be able to return to work. Second, on the first day of the 2010-2011 school year, she was asked to sit and wait in a conference room for about an hour before a meeting. Third, Plaintiff had a couple of run-ins with a coworker at Atlantic named Elizabeth Angell ("Angell"), which consisted of Angell checking on Plaintiff and once falsely claiming that Plaintiff was not in her classroom when she was supposed to be.

### 3. 2011-2012 Academic Year

Before Plaintiff joined the ELL Department at Atlantic, the school had decided that ELL teachers were to incorporate a "content area" -- math, science, social studies, or language arts -- into their curriculum. When Cherkaoui joined the Department, Defendant asked her to incorporate social studies content into her ELL classes. However, in June 2011, Defendant communicated to Plaintiff that, for the upcoming academic year, she would be assigned to incorporate science content into her ELL classes. Cherkaoui expressed to the principal of Atlantic, Maureen MacNeil ("Principal MacNeil"), that she was uncomfortable teaching science as part of her ELL curriculum because she did not have a background in science. Principal MacNeil allegedly told Plaintiff that she could either "take it or leave it." Ultimately, Plaintiff taught ELL with science content for the 2011-2012 academic year.

At the end of the 2011-2012 academic year, Cherkaoui had another run-in with her coworker, Angell. On June 15, 2012, Angell wrote a letter to Plaintiff detailing certain "frustrations" as to Plaintiff's job performance. In response, Cherkaoui sent a letter to Principal MacNeil complaining about Angell's letter and requesting that the Principal address it. Because this incident occurred at the end of the school year, Principal MacNeil did not address it until the beginning of the following academic year.

### 4. 2012-2013 Academic Year

At the beginning of the 2012-2013 school year, Principal MacNeil met separately with both Angell and Cherkaoui. At her meeting with Angell, Principal MacNeil warned Angell that the letter she had sent to Plaintiff at the end of the previous school year was inappropriate and that all personnel conflicts should be addressed through the Principal's office. Further, at Principal MacNeil's meeting with Plaintiff, they discussed all the issues raised by both Angell and Cherkaoui's letters, while Plaintiff also stressed her request for open lines of communications with Principal MacNeil. In December 2012, Angell transferred into a different department and thus no longer worked with Plaintiff.

On January 14, 2013, Plaintiff wrote a letter to Principal MacNeil detailing another run-in with a different coworker, Timothy Ryan ("Ryan"). In her letter, Plaintiff claimed

that Ryan had acted inappropriately and unprofessionally towards her in front of students. Plaintiff's grievances allegedly went unacknowledged by Principal MacNeil, and, on June 29, 2013, Plaintiff reiterated her concerns about Ryan in another letter to the Principal. In addition, Cherkaoui made reference to the "on-going overt and subtle discrimination as well as hostility" she was experiencing at Atlantic and raised concerns over her class schedule for the upcoming 2013-2014 academic year.

Plaintiff's letter of June 29, 2013 prompted an investigation by the City. Mulvey conducted an investigation during the summer of 2013, and sought to meet with Plaintiff to address the allegations. However, due to personal reasons, Plaintiff was unavailable to meet with Mulvey during the first two weeks of August 2013. On August 2, 2013, Plaintiff filed another charge with the EEOC reiterating her allegations of discrimination spelled out in the June 29, 2013 letter.

### 5. 2013-2014 Academic Year

At the end of August 2013, Plaintiff requested a job transfer to another school within the same district, North Quincy High School. However, on September 6, 2013, Cherkaoui informed her Union president, Allison Cox ("Cox"), that she was withdrawing her transfer request because she was "not interested in moving schools this far into the year." Still, Plaintiff expected to have a

-11-

meeting with Mulvey in order to discuss unresolved issues concerning her June 29, 2013 letter.

During the first days of the school year, Cherkaoui tried to meet with Principal MacNeil, but for some reason this did not happen. On September 11, 2013, Plaintiff went on sick leave because she felt that the cumulative effect of all that had happened was causing her "to give up," and that her "[coworkers] were going to wear [her] down until [she] gave up."

At some point in September 2013, Cox met with Principal MacNeil and Mulvey. On September 30, 2013, Cox informed Cherkaoui via email about the meeting, during which Cox and Principal MacNeil discussed Plaintiff's concerns over her large class size of low-fluency students, and the challenges that created for designing a science-based curriculum for a mix of students from sixth, seventh, and eighth grade. Cox further mentioned that Principal MacNeil agreed to "make every effort" to keep Plaintiff's classes from having mixed-grade students. At the meeting, however, Cox and Principal MacNeil did not discuss any of the other concerns that Plaintiff had stressed in her June 29, 2013 letter.

During October 2013, Plaintiff exchanged several emails and letters with Mulvey, in which she reiterated her claims of discrimination and "hostile environment" at Atlantic and her claim that Principal MacNeil was "not willing to provide any meaningful

remedies."  On October 2, 2013, Defendant filed its position statement to Plaintiff's EEOC charge, where, among other things, it stated that, after completing an investigation of the claims in Cherkaoui's June 29, 2013 letter, it had found no evidence of harassment.  The next day, Cherkaoui emailed Mulvey to notify him that she was still on sick leave and that, "[p]rior to returning to work, [she] need[ed] to know exactly what c[ould] be done to remedy the hostile environment [she was] continuing to experience."

Mulvey replied to Plaintiff's emails with a letter on October 8, 2013.  In that letter, Mulvey referred Plaintiff to the position statement that the City submitted to the EEOC summarizing the result of his investigation of the claims in Plaintiff's June 29, 2013 letter.  He also instructed Plaintiff that if any new events not mentioned in the June 29, 2013 letter had transpired, which she alleged had been discriminatory, she should provide him with more specifics to allow him to investigate and address those events.  Plaintiff responded a week later expressing her frustrations over the impossibility of meeting with Mulvey regarding his investigation of her June 29, 2013 letter.  In addition, in response to Mulvey's request for specific allegations of new discriminatory events, Cherkaoui pointed to the City's failure to adopt interim measures to ensure that the discriminatory

-13-

behavior would not continue, its disregard of her complaint concerning the department class scheduling for the 2013-2014 school year, misleading or incomplete information in the City's EEOC position statement, and the City's incorrect conclusion that "no one acted inappropriately toward[s her]." Lastly, Plaintiff attached a doctor's note indicating that returning to the same worksite would be detrimental to her health, and requested a transfer to a part-time ELL language arts teacher position at North Quincy High School.

Cherkaoui's transfer request was denied by Mulvey via letter on October 23, 2013, because it was made outside of the Union contract's window for transfer requests, and because there were no vacancies at North Quincy High School at that time. In addition, regarding Plaintiff's alleged disability, Mulvey noted that the doctor's note did not indicate that a transfer or part-time position was necessary for her to perform her essential functions as a teacher. If Plaintiff desired to pursue such an accommodation, he continued, she should submit to him a more specific physician's report with the accommodation request, along with an explanation of the accommodation's necessity by October 30, 2013.

On October 28, 2013, Plaintiff submitted a letter of resignation from her position as an ELL teacher at Atlantic. In

her letter she cited "the absolutely intolerable working conditions [that] caused [her] to experience serious health problems, both physically and emotionally" as the reason for her resignation. The City accepted her resignation on the following day.

## B. Procedural History

On January 9, 2010, Cherkaoui filed charges of discrimination based on religion and retaliation with the EEOC against Defendant. On February 17, 2010, Cherkaoui amended her charge to include a claim for disability discrimination. On August 7, 2013, Cherkaoui filed an additional charge with the EEOC based on further and continuing discrimination and retaliation based on the same discriminatory animus. Cherkaoui then amended this charge in November 2013 to include a claim for constructive discharge. On December 11, 2013, the EEOC issued a Right to Sue Letter on Cherkaoui's claims.

On March 7, 2014, Cherkaoui filed a complaint with the district court, which she amended on June 27, 2014. Her amended complaint alleged that she was discriminated against on the basis of her religion and disability, that she had suffered retaliation due to her exercise of protected activity, and that she was constructively discharged, all in violation of state and federal laws. The City moved for summary judgment on all claims. After

a hearing on the motion for summary judgment, the magistrate judge issued his Report and Recommendations on the motion, which recommended that the district court grant summary judgment in favor of the City on all counts of the amended complaint. The district court adopted this recommendation and entered judgment for the City dismissing the amended complaint. This timely appeal followed.

## II. **Analysis**

### A. **Summary Judgment**

We review the district court's grant of summary judgment de novo. ATC Realty, LLC v. Town of Kingston, 303 F.3d 91, 94 (1st Cir. 2002). "Although we will draw all reasonable inferences in the nonmovant's favor, we will not 'draw unreasonable inferences or credit bald assertions, empty conclusions, rank conjecture, or vitriolic invective.'" Pina, 740 F.3d at 795 (quoting Cabán-Hernández v. Philip Morris USA, Inc., 486 F.3d 1, 8 (1st Cir. 2007)). Summary judgment is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Facts are material when they have the "potential to affect the outcome of the suit under the applicable law." Sánchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996). "A dispute is 'genuine' if 'the evidence about the fact is such that a reasonable

-16-

jury could resolve the point in the favor of the non-moving party.'" Id. (quoting Rivera-Muriente v. Agosto-Alicea, 959 F.2d 349, 352 (1st Cir. 1992)). A court will disregard "conclusory allegations, improbable inferences, and unsupported speculation" in determining whether a genuine factual dispute exists. Sullivan v. City of Springfield, 561 F.3d 7, 14 (1st Cir. 2009) (citation omitted). Furthermore, the nonmovant must provide sufficiently supported evidence, without relying "upon mere allegation or denials of [the movant's] pleading," to establish a genuine issue for trial. LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841 (1st Cir. 1993) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)). That is, the "plaintiff . . . [must] offer[]. . . 'significant probative evidence tending to support the complaint.'" Feliciano v. Rhode Island, 160 F.3d 780, 784 (1st Cir. 1998) (quoting Anderson, 477 U.S. at 256).

Plaintiff brings both federal and pendent state claims. It is true that the Massachusetts Supreme Judicial Court ("SJC") has interpreted Mass. Gen. Laws ch. 151B differently on occasion than Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e-2000e-17. See, e.g., Cuddyer v. Stop & Shop Supermarket Co., 750 N.E.2d 928, 939-40 (Mass. 2001). It has also interpreted state disability discrimination claims differently than the ADA, 42 U.S.C. §§ 12101-12213. See, e.g., Dahill v.

Police Dep't of Bos., 748 N.E.2d 956, 963-64 (Mass. 2001). But Plaintiff has not argued there are any material differences relevant here, and the SJC has consistently applied the three-step burden-shifting framework from McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), to antidiscrimination suits under chapter 151B. See, e.g., Verdrager v. Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., 50 N.E.3d 778, 793 (Mass. 2016). And so we refer to federal law.

### 1. Discrimination

"Where, as here, there is no direct evidence of discrimination, [Plaintiff] must rely on the three-stage burden-shifting framework outlined in McDonnell Douglas Corp." Garmon v. Nat'l R.R. Passenger Corp., 844 F.3d 307, 313 (1st Cir. 2016) (citing McDonnell Douglas, 411 U.S. at 802). Under this framework, a plaintiff bears the initial burden of proffering evidence sufficient to establish a prima facie case of discrimination. McDonnell-Douglas, 411 U.S. at 802. "The prima facie case varies according to the nature of the plaintiff's claim but it requires, among other things, a showing of an adverse employment action." Alvarado-Santos v. Dep't of Health of P.R., 619 F.3d 126, 132 (1st Cir. 2010). Once a plaintiff has made a prima facie showing, she "creates a rebuttable presumption that [Defendant] engaged in discrimination." Pina, 740 F.3d at 796.

-18-

The defendant may then "rebut this presumption by pointing to evidence of a legitimate, non-discriminatory reason for the challenged conduct." Garmon, 844 F.3d at 313. If the defendant is able to make that showing, "the presumption of discrimination disappears and the burden of production again shifts to [plaintiff], who must offer evidence that [defendant's] explanation is pretextual and that discriminatory animus prompted the adverse action." Id.

Cherkaoui argues, on appeal, that the district court failed to consider all the evidence in the light most favorable to her, that it improperly weighed witnesses' credibility, and that it failed to consider the cumulative effect of all of her alleged adverse incidents. Cherkaoui further alleges that the City failed to articulate legitimate nondiscriminatory reasons for the actions taken against her, and that, even if it did, she offered sufficient evidence of pretext for a reasonable jury to infer discriminatory intent. As we will explain, Plaintiff's arguments are without merit.

The district court found that Plaintiff "made a prima facie case of religious and disability discrimination but the [C]ity ha[d] proffered legitimate nondiscriminatory reasons for its treatment of the plaintiff." Cherkaoui v. City of Quincy, 213 F. Supp. 3d 264, 279 (D. Mass. 2016). Furthermore, the court

-19-

below determined that the record lacked evidence "that would allow a jury to find by a preponderance of the evidence that those reasons were pretextual." Id. The parties disagree as to whether Cherkaoui made a prima facie showing of discrimination. In particular, the City alleges that there is no evidence that Cherkaoui suffered any adverse employment action.

Plaintiff alleges several incidents with QPS personnel as proof of discrimination; however, neither in her briefs below nor on appeal does she identify any specific incident amounting to an "adverse employment action," nor does she specify whether these incidents were based on her religion or her alleged disability. "An 'adverse employment action' is one that 'affect[s] employment or alter[s] the conditions of the workplace.'" Morales-Vallellanes v. Potter, 605 F.3d 27, 35 (1st Cir. 2010) (quoting Burlington Indus., Inc. v. Ellerth, 524 U.S. 740, 761 (1998)). To determine if an employment action is in fact "adverse," we look for whether it has "materially change[d] the conditions of plaintiff['s] employ." Gu v. Bos. Police Dep't, 312 F.3d 6, 14 (1st Cir. 2002). These changes "must be more disruptive than a mere inconvenience or an alteration of job responsibilities." Burns v. Johnson, 829 F.3d 1, 10 (1st Cir. 2016) (quoting Morales-Vallellanes, 605 F.3d at 35). Reassignments may be actionable if they involve "significant different responsibilities." Id.; see

-20-

also Marrero v. Goya of P.R., Inc., 304 F.3d 7, 23 (1st Cir. 2002) ("[A] transfer or reassignment that involves only minor changes in working conditions normally does not constitute an adverse employment action."). "We gauge whether such a change is materially adverse 'by an objective standard.'" Burns, 826 F.3d at 10; see also Booker v. Mass. Dep't of Pub. Health, 612 F.3d 34, 42 (1st Cir. 2010).

Some of the complained-of actions clearly fail to meet that test. We will assume arguendo that certain actions arguably qualify. These are: (1) the three-day suspension in 2010; (2) the change in her ELL teaching assignment to include a science component and larger class sizes; and (3) the City's failure to accommodate her requests for transfer.[1] See Burns, 829 F.3d at 10 (noting that reassignment with significantly different responsibilities may be an actionable "adverse employment action"); Sensing v. Outback Steakhouse of Fla., LLC, 575 F.3d 145, 157 (1st Cir. 2009) (noting that showing that an employer failed to provide a reasonable accommodation after knowing of an employee's alleged disability may be an "adverse employment action").[2] We need not decide if these actions in fact constitute

---

[1] We take no position as to whether these requests would constitute "reasonable requests" for purposes of Plaintiff's disability claims.

[2] We find that Cherkaoui's split assignment between Atlantic and

-21-

adverse employment actions because even if we ruled that Cherkaoui established a prima facie case of discrimination, "her claim[s] still fail[] because she cannot show that the nondiscriminatory explanation for her [treatment] articulated by [Defendant] was pretextual cover for their true, discriminatory motive."  Pina, 740 F.3d at 797.

Assuming Cherkaoui has established a prima facie case of discrimination based on these three "adverse employment actions," the next step of the McDonnell Douglas framework requires the defendant to produce and "articulat[e] a legitimate, nondiscriminatory reason for the adverse employment decision[s]. . . ."  Mesnick v. Gen. Elec. Co., 950 F.2d 816, 823 (1st Cir. 1991).  This is only a "burden of production, not a burden of persuasion. . . ."  Id.  It is the Plaintiff who carries the

---

Sterling in 2009 was not an "adverse employment action" because this assignment was the result of Defendant accommodating Plaintiff's request for a full-time position, and this split assignment was the only full-time position available at that time. Cf. Deleon v. Kalamazoo Cty. Rd. Comm'n, 739 F.3d 914, 922 (6th Cir. 2014), cert. denied, 135 S. Ct. 783 (2015) (Sutton, J., dissenting) ("No case to my knowledge holds that granting a sought-after transfer by itself amounts to an adverse employment action.") (emphasis added); Simpson v. Borg-Warner Auto., Inc., 196 F.3d 873, 876 (7th Cir. 1999) (finding no adverse employment action when employee voluntarily sought her new position).  But see Spees v. James Marine, Inc., 617 F.3d 380, 387 (6th Cir. 2010) (noting that if an employee "believed the change was necessary in order to keep her job," then the employee could recover in light of a requested transfer).

burden of persuasion at all times.  See id.; Pina, 740 F.3d at 796.

As the record shows, Defendant provided competent evidence showing that each of the above-mentioned adverse employment actions were based on legitimate nondiscriminatory reasons.  First, the City's disciplinary actions against Plaintiff were in response to Cherkaoui's tardiness, even after Defendant had provided her an additional ten minutes of travel time between schools.  Furthermore, the City produced evidence that other teachers in the QPS were similarly disciplined for being tardy, and that Plaintiff had admitted to being late on at least one occasion.

Second, Defendant offered evidence showing that Plaintiff's abnormally large class and the directive that she include a science component in her ELL classes were based on student needs and the qualifications of the pool of teachers at Atlantic at the time.  In 2011, due to budgetary constraints, Atlantic lost their science-content ELL teacher, Thai Dang.  At that moment, Plaintiff was the only one, out of the three remaining ELL teachers at Atlantic, who was not specifically qualified to teach any of the other content areas required to be incorporated into the ELL classes.[3]  After the three ELL teachers met and

_____

[3]  The other two ELL teachers at Atlantic were Angell, certified

discussed the matter, Plaintiff agreed to cover the need for the science content of the ELL classes.

Third, Defendant also provided evidence as to why it could not accommodate all of Cherkaoui's requests. To begin with, Defendant did provide Plaintiff with clear lines of communications by directing her to Principal MacNeil and Elizabeth Hallet, the ELL Department Chair, to discuss her teaching responsibilities at the beginning of the 2010-2011 academic year. Yet, Defendant explained to Plaintiff the infeasibility of her request for 24-hour notice of all meetings due to the way a school normally operates.[4] As to Plaintiff's 2013 transfer requests, the City offered evidence showing it denied them because of legitimate nondiscriminatory reasons. Cherkaoui withdrew her first transfer request before the administration could respond to it. On the other hand, the City denied her second transfer request because it was submitted outside of the Union's contract window for transfer

---

as an English/Reading teacher, and Thao Nguyen-Ippolito who was in pursuit of her certification as a math teacher.

[4] According to a letter sent to Plaintiff on July 20, 2010, the school was unable to accommodate her request for a 24-hour notice for all meetings, other than ordinary meetings, because part of the school administration supervision of students and staff is done in an informal manner, such as through walkthroughs.

requests and there were no vacancies available at the requested school.[5]

Since Defendant successfully submitted evidence showing a legitimate nondiscriminatory reason for each of the adverse employment actions alleged by Plaintiff, the burden shifts back to Plaintiff to show, by a preponderance of the evidence, that the reasons provided "w[ere] mere pretext and that their true motive was discriminatory." Pina, 740 F.3d at 797. It is insufficient that Plaintiff "'impugn the veracity' of the employer's proffered reason[s] . . . ; instead, a plaintiff must proffer specific facts that would enable a reasonable factfinder to conclude that the employer's reason for termination was a 'sham' intended to cover up the employer's true motive." Ponte v. Steelcase Inc., 741 F.3d 310, 323 (1st Cir. 2014) (quoting Mesnick, 950 F.2d at 824).

Plaintiff "may point to 'weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons'" to support an inference

---

[5] Moreover, we do not find the City's request for an IME to be an "adverse employment action." Defendant provided evidence that it was part of the school's policy to require its employees to undergo an examination by an IME upon applying for extended sick leave. Also, even though Plaintiff alleges that the City failed to address her concerns as to her discrimination claims in her June 29, 2013 letter, the record shows otherwise. Plaintiff may not agree with its conclusions, but Defendant proffered evidence that it did investigate Plaintiff's claims and found no evidence of discrimination or a hostile work environment.

that these were not legitimate nondiscriminatory reasons. <u>Pina</u>, 740 F.3d at 797 (quoting <u>Straughn</u> v. <u>Delta Airlines, Inc.</u>, 250 F.3d 23, 42 (1st Cir. 2001)). However, Plaintiff fails to make this showing. Plaintiff points to the fact that she had ten successful years of employment in the QPS without a negative incident, and it was not until April 2009 -- when she started wearing her headscarf to school -- that she began to have conflicts with coworkers and supervisors. This is insufficient to raise a triable issue of fact. "[T]emporal proximity alone can suffice to 'meet the relatively light burden of establishing a prima facie case of <u>retaliation</u>.'" <u>DeCaire</u> v. <u>Mukasey</u>, 530 F.3d 1, 19 (1st Cir. 2008) (emphasis added) (quoting <u>Mariani-Colón</u> v. <u>Dep't of Homeland Sec. ex. rel. Chertoff</u>, 511 F.3d 216, 224 (1st Cir. 2007)). Nevertheless, "while temporal proximity is one factor from which an employer's bad motive can be inferred, by itself, it is not enough--especially if the surrounding circumstances undermine any claim of causation." <u>Carrero-Ojeda</u> v. <u>Autoridad de Energía Eléctrica</u>, 755 F.3d 711, 720 (1st Cir. 2014).

Plaintiff does not point to any specific facts or evidence in the record that would demonstrate pretext. At most, her case rests on unsupported speculation and conclusory allegations that Defendant purposely created a "hostile environment" by changing her assignments and denying her transfer

-26-

requests. She is unable to show that Defendant's proffered reasons were pretextual, and therefore does not raise a triable issue of fact. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507-08 (1993).[6]

Accordingly, because Cherkaoui was unable to rebut the City's proffered legitimate, nondiscriminatory basis for its actions with evidence of pretext and discriminatory motive, the district court properly granted summary judgment in favor of the City as to Plaintiff's discrimination claims.

## 2. Retaliation

Plaintiff's retaliation claims, both state and federal, are also governed by the McDonnell Douglas three-stage burden-shifting framework. Pina, 740 F.3d at 800; see also Prescott v. Higgins, 538 F.3d 32, 40 (1st Cir. 2008). To establish a prima facie case of retaliation, Plaintiff must "show that (1) she undertook protected conduct; (2) she suffered an adverse employment action, and (3) the two were causally linked." Noviello v. City of Bos., 398 F.3d 76, 88, (1st Cir. 2005); Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 25 (1st Cir. 2004).

---

[6] While Cherkaoui cites case law supporting the proposition that discriminatory enforcement of the City's IME policy is illegal, see Flynn v. Raytheon Co., 868 F. Supp. 383, 387-88 (D. Mass. 1994), she fails to provide any evidence that the City has implemented or enforced the IME policy differently against persons outside of her protected class.

Once Plaintiff has made a prima facie showing of retaliation, "[D]efendant must articulate a legitimate, non-retaliatory reason for its employment decision." Id. at 26. "If the [D]efendant meets this burden, then [P]laintiff must show that the proffered legitimate reason is pretextual and that 'the job action was the result of the [D]efendant's retaliatory animus.'" Kelley v. Corr. Med. Servs., Inc., 707 F.3d 108, 115 (1st Cir. 2013) (quoting St. Mary's Honor Ctr., 509 U.S. at 510-11).

It is beyond dispute that Plaintiff engaged in protected conduct when she filed her first EEOC charges on January 9, 2010, and again when she filed her second charge, as a continuing action, on August 7, 2013.[7] Only some of the adverse actions that Cherkaoui alleges came after the protected conduct. These are: (1) the City's requirement that Plaintiff undergo an IME to substantiate her application for extended sick leave benefits; (2) the change in Cherkaoui's teaching assignment which included

---

[7] Plaintiff alleges that she "engaged in explicit protected activity when she asked Barrett if she was being treated in a hostile manner because of her headscarf" during the meeting on November 17, 2009. However, Plaintiff does not develop the argument as to why her comment during a meeting to discuss a written warning constitutes a protected opposition activity under Title VII. Plaintiff's "skeletal" allegation is not enough for this Court to rightfully consider her comment during the November 17, 2009 meeting as a protected opposition activity. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

abnormally large class sizes, a mixture of students of different grade-levels, and the requirement that she include a science component in her ELL classes; (3) the City's denial of Plaintiff's transfer requests; and (4) the City's alleged failure to investigate the claims in Plaintiff's June 29, 2013 letter.

For purposes of our analysis, we will assume without deciding that these were all "adverse employment actions" against Plaintiff. A review of the records reveals that Plaintiff fails to provide any evidence that the City took any of these actions against her because of her protected activity. Instead, Plaintiff relies solely on temporal proximity to establish causation. "The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close.'" Clark Cty. Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001) (quoting O'Neil v. Ferguson Constr. Co., 237 F.3d 1248, 1253 (10th Cir. 2001)). Most of the alleged "adverse employment actions" here occurred years after Plaintiff filed her first EEOC charge. We have recognized that "[t]hree and four month periods have been held insufficient to establish a causal connection based on temporal proximity." Calero-Cerezo, 355 F.3d at 25. In addition, as previously discussed, Defendant produced legitimate

and non-retaliatory reasons for Cherkaoui's teaching assignment, large class sizes, and mixture of students of different grade-levels. At the time, these decisions were made based on student needs and ELL faculty availability. The City's denial of Plaintiff's transfer requests was not related to her protected conduct, but to the fact that Cherkaoui withdrew her first transfer request and her second transfer request was submitted outside of the Union's contract window.

As to Plaintiff's allegation that the City failed to investigate the claims raised in her June 29, 2013 letter, the record shows that Defendant did conduct an investigation and sought, to no avail, to include Plaintiff's participation.

The only alleged "adverse employment action" against Plaintiff with a close temporal proximity to her first EEOC charge was the City's requirement that Plaintiff undergo an IME to substantiate her application for extended sick leave benefits. But, the City produced evidence that, under the Union contract, the City "may request any form of evidence of the [employee's] disability, to wit: a report from the [City's] own doctor," and that it had required the same from other teachers in similar circumstances. The City informed Plaintiff that it was exercising its right under the Union contract's provision, and Plaintiff indicated her willingness to comply as long as she was

"reasonabl[y] accommodat[ed] for [her] religious faith." The City conformed to her request and, once it received the IME report, approved Plaintiff's request for extended sick leave. The City proffered enough evidence to show it required the IME for legitimate non-retaliatory reasons. Plaintiff has failed to provide any evidence to the contrary.

In conclusion, the record lacks evidence that shows that the City retaliated against Cherkaoui because she filed EEOC charges of religious and disability discrimination against Defendant. Therefore, the district court properly granted Defendant's motion for summary judgment on Plaintiff's retaliation claims.

### 3. Constructive Discharge

Finally, Cherkaoui claims that Defendant constructively discharged her, in violation of Mass. Gen. Laws ch. 151B and Title VII. In order to prevail on a constructive discharge claim, a plaintiff "must show that (1) 'a reasonable person in [her] position would have felt compelled to resign' and (2) '[she] actually resigned.'" Vélez-Ramírez v. P.R. through Sec'y of Justice, 827 F.3d 154, 158 (1st Cir. 2016) (quoting Green v. Brennan, 136 S. Ct. 1769, 1777, (2016)).

When we assess a constructive discharge claim, we "must gauge whether the working conditions imposed by the employer had

become so onerous, abusive, or unpleasant that a reasonable person in the employee's position would have felt compelled to resign." Suárez v. Pueblo Int'l, Inc., 229 F.3d 49, 54 (1st Cir. 2000). Our assessment cannot rest solely on Plaintiff's subjective views of her work situation. See id. As we have explained, "[t]he ultimate test is one of objective reasonableness." Id.

After a review of the record, and viewing the facts in a manner most favorable to the Plaintiff, we cannot conclude that Plaintiff's working conditions had reached a level of unbearableness where a reasonable person would have resigned. Even though Plaintiff did encounter several uncomfortable situations within her work place, none of these show a pattern of unusually aggravating working conditions. GTE Prod. Corp. v. Stewart, 653 N.E.2d 161, 169 (Mass. 1995) ("In order to amount to a constructive discharge, adverse working conditions must be unusually aggravated or amount to a continuous pattern before the situation will be deemed intolerable." (internal quotation marks and citations omitted)). In fact, the City had taken steps to investigate her allegations of discriminatory treatment and accommodated many of her requests.

Midway through the 2013-2014 academic year, Plaintiff was working full-time at Atlantic, she no longer worked with any of her alleged harassers, her school Principal had agreed to make

-32-

every effort to reduce her class sizes and mixed-grade students, and Defendant had inquired into her allegations made in the June 29, 2013 letter. As to her transfer request as a reasonable accommodation, the City did not deny her request outright, but rather requested further information in order to properly review her request. The City's request was nothing more than the fulfillment of its duty "to engage in an interactive process" regarding Plaintiff's accommodation request. See Ortiz-Martínez v. Fresenius Health Partners, PR, LLC, 853 F.3d 599, 605 (1st Cir. 2017) (quoting EEOC v. Kohl's Dep't Stores, Inc., 774 F.3d 127, 132 (1st Cir. 2014)).

"The workplace is not a cocoon, and those who labor in it are expected to have reasonably thick skins--thick enough, at least, to survive the ordinary slings and arrows that workers routinely encounter in a hard, cold world." Suárez, 229 F.3d at 54 (1st Cir. 2000). Plaintiff did not meet her burden to show she was constructively discharged. Accordingly, the district court properly granted summary judgment to Defendant on Plaintiff's constructive discharge claims.

### III. Conclusion

For the foregoing reasons, the district court judgment is affirmed.

**Affirmed.**