STATE OF MAINE                              SUPERIOR COURT
PENOBSCOT, SS                               CIVIL ACTION
                                            DOCKET NO. BANSC-CV-2019-00040


LISA K. NASH,                    )
          Plaintiff,             )
                                 )
                                 )          Order on Defendants' Motion for
                                 )          Summary Judgment
     v.                          )
                                 )
STATE OF MAINE,                  )
DEPARTMENT OF CORRECTIONS,       )
and JOSEPH FITZPATRICK,          )
          Defendants.            )


Before the Court is Defendants Department of Corrections' and Dr. Joseph Fitzpatrick's Motion for Summary Judgment on both counts of Plaintiff's Complaint pursuant to M.R. Civ. P. 56. Oral argument was held on July 18, 2022. Richard O'Meara, Esq. and Alison Tozier, Esq. appeared for the Plaintiff. F. David Walker, Esq. and Anne-Marie Storey, Esq. appeared for the Department of Corrections. Michael Messerschmidt, Esq. and Laura Rideout, Esq. appeared for Dr. Joseph Fitzpatrick.


## I.    Factual Background

In support of their motions, Defendant Maine Department of Corrections ("DOC") and

Defendant Joseph Fitzpatrick submitted a Joint Statement of Material Facts ("Supp.'g S.M.F.")

which contained 168 statements of fact. In opposition, Plaintiff responded to the statements of fact

and filed her own Statement of Additional Material Fact" ("Opp. S.M.F.") which contained an

additional 248 statements of fact. Defendants replied with a "Joint Reply Statement of Material

Facts" ("Reply S.M.F."), to which Plaintiff responded ("Opp. Reply S.M.F.").[1] After review of the

---

[1] The Court seriously considered whether the Motion for Summary Judgment should simply be denied due to the number of statements of material fact that were asserted. *See Oceanic Inn, Inc. v. Sloan's Cove, LLC*, 2016 ME 34, ¶ 4 n.2, 133 A.3d 1021; *First Tracks Invs., LLC v. Murray, Plumb & Murray*, 2015 ME 104, ¶¶ 2-3, 121 A.3d 1279; *Stanley v. Hancock Cty. Comm'rs*, 2004 ME 157, ¶¶ 27-29, 864 A.2d 169. However, the Motion will be evaluated on its merits.

record, the Court finds the following facts to be material, admissible, and supported by the summary judgment record.

The plaintiff in this case is Lisa Nash. She holds an undergraduate degree and a master's degree in criminal justice. (Opp. S.M.F. ¶¶ 2, 5.) Nash worked for the DOC for over thirty-three years, from 1983 until 2016. (Opp. S.M.F. ¶ 3.) During her employment, Nash worked in several roles, including as an adult probation officer, Regional Correction Manager ("RCM"), and finally as a Regional Correction Administrator ("RCA"). (Opp. S.M.F. ¶ 6.) She held the RCA position from 2005 to 2015. (Opp. S.M.F. ¶ 9.) Nash engaged in efforts to improve Adult Community Corrections. (Opp. S.M.F. ¶¶ 15-22.) Nash received a judicial award for her work on the Drug Court. (Opp. S.M.F. ¶ 69.) At times she faced resistance from some of her subordinates.[2] (Opp. S.M.F. ¶¶ 23, 25.) As an RCA, Nash could only be removed for cause. (Opp. S.M.F. ¶ 208.)

From 2011 to 2014, Joseph Ponte was the Commissioner of the DOC. (Opp. S.M.F. ¶ 26.) During his tenure, Ponte promoted several women to leadership roles. (Opp. S.M.F. ¶¶ 28-32.) Ponte left the DOC after being recruited to work for the State of New York. (Opp. S.M.F. ¶ 34.)

Defendant Dr. Joseph Fitzpatrick began working for the DOC in 1994 as a clinical psychiatrist with the Maine Correctional Center. (Supp.'g S.M.F. ¶ 1.) In 2013, Fitzpatrick became an Associate Commissioner and in 2014 he replaced Ponte as Commissioner of the DOC. (Supp.'g S.M.F. ¶¶ 1-2.) Fitzpatrick was Commissioner at all times relevant to Ms. Nash's complaint. (Opp. S.M.F. ¶ 4.) It was common for new DOC commissioners to make organizational changes and move positions around. (Supp.'g S.M.F. ¶ 155.) Fitzpatrick created a deputy commissioner position (the second in command within the DOC) and appointed Jody Breton to this position.

---

[2] Nash believed that the resistance she faced was due to philosophical differences and the resistance was stronger because of her gender. (Opp. S.M.F. ¶ 25.) Whether Nash actually faced resistance for philosophical issues or that it was stronger because of her gender is in dispute.

2

(Supp.'g S.M.F. ¶ 156.) Fitzpatrick also began to decentralize aspects of the DOC. (Supp.'g S.M.F. ¶ 159.) This decentralization resulted in reorganizing some units and affected the responsibilities of both men and women working in the DOC. (Supp.'g S.M.F. ¶¶ 160-68.)

The structure of the DOC initially was as follows. Directly below the Commissioner were three Associate Commissioners: Cindy Brann, Colin O'Neill, and Jody Breton. (Supp.'g S.M.F. ¶ 3.) As noted above, Breton was also the Deputy Commissioner. (Supp.'g S.M.F. ¶ 4.) Adult Community Corrections is one unit within the DOC, split into three regions ("Regions 1, 2, and 3"). (Opp. S.M.F. ¶¶ 6-7.) Each region was led by an RCA. (Supp.'g S.M.F. ¶ 9; Opp. S.M.F. ¶¶ 7-9.) Below the RCAs there were three or four RCMs in each of the DOC's three regions who supervised the probation officers and assistants. (Supp.'g S.M.F. ¶¶ 6-7; Opp. S.M.F. ¶ 7.)

Before September 10, 2015, Nash was the RCA in Region 1; Susan Gagnon was the RCA in Region 2; and Willard ("Bill") Goodwin was the RCA in Region 3. (Supp.'g S.M.F. ¶ 9; Opp. S.M.F. ¶¶ 7-9.) As RCA, Nash directly supervised approximately seven people: four RCMs and three clerical associates, one of whom was Carol Carlow.[3] (Opp. S.M.F. ¶ 10.) After 2012, Nash supervised RCMs Matt Nee, Allen Wright, Chris Arbour, and Sue Weichman (sex offender specialist for all regions). (Opp. S.M.F. ¶¶ 11-12.)

During his tenure as commissioner, some women in the DOC believed Fitzpatrick did not support them in leadership roles. (Opp. S.M.F. ¶ 36.) Brann was appointed as an Associate Commissioner by Commissioner Ponte. (Opp. S.M.F. ¶ 32.) Associate Commissioner Brann believed that Commissioner Fitzpatrick excluded her from leadership meetings she should have been invited to attend and made it more difficult for her to do her job. (Opp. S.M.F. ¶¶ 44-45.) Brann emailed Fitzpatrick to get his attention, but her efforts were usually unsuccessful. (Opp.

---

[3] Defendants qualified this by saying that the record does not indicate that the number of people Nash supervised remained constant the entire time she was an RCA.

3

S.M.F. ¶ 48.) Brann complained to human resources about Fitzpatrick treating her differently from male leaders. (Opp. S.M.F. ¶ 49.) When Brann approached Fitzpatrick to discuss her perception that he was excluding and ignoring her, he told her she was being "too emotional" and that "everything was fine".[4] (Opp. S.M.F. ¶ 53) Fitzpatrick removed Brann's leadership over the minimum-security facilities. (Opp. S.M.F. ¶ 38.) Brann eventually left the Maine DOC and went to work for Ponte in New York and is now the Commissioner of New York City's Department of Corrections. (Opp. S.M.F. ¶¶ 54, 56.) Dr. Judy Beale's employment also changed after Fitzpatrick became commissioner. (Opp. S.M.F. ¶ 57.) Beale was demoted from Director of Programs to Associate Director of Programs. (Opp. S.M.F. ¶ 57.) Beale was then required to report to a new male supervisor, the male who replaced her as Director of Programs. (Opp. S.M.F. ¶ 57.) When Beale asked Fitzpatrick what would be changing for her with Ryan Thornell as her direct supervisor, he said nothing would change; but when she returned to her office, Thornell was occupying her office and told her that he would be overseeing the whole programming division, which was what Beale had previously done. (Opp. S.M.F. 63). Over time, Beale's responsibilities were whittled down. (Opp. S.M.F. ¶ 64.) Beale was ultimately fired by Fitzpatrick and now works under Brann in New York City as deputy commissioner of programs and community partnerships. (Opp. S.M.F. ¶¶ 65, 67.)

At all relevant times, Charlene Gamage worked for the Department of Administrative and Financial Services as the Director of Human Resources and was assigned to the DOC. (Supp.'g S.M.F. ¶ 10.) Laurie Hayden was an HR generalist responsible for DOC recruiting. (Supp.'g S.M.F. ¶ 11.) Rhonda Hutchinson-Peaslee was an HR manager assigned to oversee Adult

---

[4] While Fitzpatrick denies making this statement, it is accepted for purposes of the Motion for Summary Judgment.

Community Corrections, Juvenile Community Corrections, and other OAFS employees assigned to DOC. (Supp.'g S.M.F. ¶ 11.)

### a. Climate Survey

Daniel Tourtelotte, the Executive Director of the Maine State Law Enforcement Association received complaints from probation officer members about both Wright and Nash, with no indication the complaints had to do with gender. (Supp.'g S.M.F. ¶¶ 12-21.) On July 27, 2015, Tourtelotte told Fitzpatrick that there were difficulties with management in Region 1. (Supp.'g S.M.F. ¶¶ 21-22.) Tourtelotte requested DOC look into the allegations of unprofessional behavior before he pursued a grievance.[5] (Supp.'g S.M.F. ¶¶ 21-22.) Fitzpatrick agreed to look into the situation. (Supp.'g S.M.F. ¶ 22.)

Fitzpatrick consulted with Gamage and ultimately requested a systemic climate survey be distributed to determine whether the allegations were true. (Supp.'g S.M.F. ¶¶ 23-26; Opp. S.M.F. ¶ 136.) The survey was sent to all Adult Corrections employees in all three regions and sought feedback regarding their work environment. (Supp.'g S.M.F. ¶¶ 27-28.) Participation was voluntary and answers were anonymous. (Supp.'g S.M.F. ¶¶ 27, 30.) Not all Region 1 staff participated in the survey. (Opp. S.M.F. ¶ 141.)

In late July or early August 2015, Fitzpatrick reviewed the results. (Supp.'g S.M.F. ¶¶ 46-47.) Many Region 1 survey respondents answered that they had personally experienced or witnessed behavior that they considered to be intimidating, retaliatory, or harassing against them at work and the majority indicated the behavior was perpetrated by a supervisor. (Supp.'g S.M.F. ¶¶ 31-45.) Nash's name was not singled out in any question. (Opp. S.M.F. ¶ 145.) The survey

---

[5] A formal grievance was never filed against Nash. (Opp. S.M.F. ¶ 135.)

responses did, however, name Nash and Wright and included descriptions of individual behavior by Wright and Nash and Nash's failure to address Wright's behavior. (Supp.'g S.M.F. ¶¶ 36-37, 40-42.) For example, one respondent noted that Wright had continuously perpetrated hostile, unprofessional, and harassing behavior for years and that his behavior continues to go unchecked by Nash and "[p]eople do not report misconduct here for fear of retaliation by supervisors, it is the office culture here." (Opp. S.M.F. ¶¶ 41, 43.) Another described Nash as overwhelming and challenging, often raising her voice to get her point across. (Supp.'g S.M.F. ¶ 40.) The results reflected employee dissatisfaction in Region 1 and Region 1 had more negative feedback than the other regions. (Supp.'g S.M.F. ¶¶ 50-51.) Fitzpatrick, Breton, and human resources discussed next steps. (Supp.'g S.M.F. ¶ 48.)

Nash agrees nothing in the survey was biased or discriminatory based on her gender. (Supp.'g S.M.F. ¶ 52.) Nash agrees Fitzpatrick did not control the results of the survey. (Supp.'g S.M.F. ¶ 53.)

After the Climate Survey results were received, Fitzpatrick and O'Neill visited Nash and informed her that there were "issues with morale" in her region. (Supp.'g S.M.F. ¶ 49; Opp. S.M.F. ¶¶ 22-22.) However, after they informed Nash that there were issues with morale in her region, she asked for more detail so she could address the issues immediately and they refused to provide her with any specific details. (Opp. S.M.F. ¶¶ 221-24.) Nash was not provided with a copy of the climate survey results until right before she was fired. (Opp. S.M.F. ¶ 142.)


b. New Director Position

6

On August 7, 2015, Brann left the DOC. (Supp.'g S.M.F. ¶ 120; Opp. S.M.F. ¶ 74.) The Associate Commissioner role was considered an "appointee" position meaning the person in that role could be fired at the Commissioner's discretion. (Supp.'g S.M.F. ¶ 75.)

Before Brann announced her retirement, Goodwin told Nash and other DOC employees that Fitzpatrick had asked him if he wanted to lead Adult Community Corrections as an Associate Commissioner.[6] (Opp. S.M.F. ¶ 73; Reply S.M.F. ¶ 73.) When talking with Fitzpatrick about the position (the extent of the discussion being disputed), Goodwin indicated to Fitzpatrick he would need more job security than an appointee position. (Opp. S.M.F. ¶¶ 76, 79-80.) Thereafter, Fitzpatrick consulted with Goodwin about the possibility of a new position of Director of Adult Community Corrections, including what type of position it would be, the responsibilities of the position, whether those responsibilities could be performed at the director level, and the anticipated salary. (Supp.'g S.M.F. ¶¶ 123-24; Opp. S.M.F. ¶¶ 79-80.) Before it was posted, Goodwin told Nash and others that Fitzpatrick had offered the new position to him.[7] (Opp. S.M.F. ¶ 81.) Goodwin later testified that he lied to co-workers about being offered the job to dissuade anyone else from

---

[6] Whether Fitzpatrick did in fact offer Goodwin a job leading Adult Community Corrections either as a appointed position or before it was posted as a director position is a matter is dispute. Defendants argue the statement is inadmissible hearsay to the extent it is being offered for its truth and does not qualify as an admission by a party opponent because Goodwin is not a party and the statement was not made within the scope of his employment. Nash argues it is not hearsay and does qualify as an admission by a party opponent because Fitzpatrick is a party, and the statement is being offered against him and whether it was made within the scope of Goodwin's employment is a question for the jury. To qualify as an admission by a party-opponent, a statement must be offered against an opposing party and be "made by the party's agent or employee on a matter within the scope of that relationship and while it existed, but was not made to the principal or employer." M.R. Evid. 801(d)(2)(D). To determine whether an employee is acting within the scope of the employment relationship the conduct (a) must be of the kind he is employed to perform; (b) occur substantially within the authorized time and space limits; and (c) be actuated, at least in part, by a purpose to serve the master. *See State v. Cornhuskers Motor Lines, Inc.*, 2004 ME 101, ¶ 12, 854 A.2d 189 (quoting RESTATEMENT (SECOND) OF AGENCY § 228(1) (AM. LAW INST., 1958)). Given the current record and accepting the evidence in the light most favorable to Nash, for purposes of summary judgment, the Court admits the statement.

[7] Again, given the current record, accepting the evidence in the light most favorable to Nash, for purposes of summary judgment, the Court admits the statement that Fitzpatrick offered Goodwin the job before it was posted as an admission by a party opponent.

7

applying and because he was tired of fielding questions about it from co-workers. (Reply S.M.F. ¶ 73.)

According to Fitzpatrick, the conversation with Goodwin was to solicit feedback and to gauge potential interest in a new director-level position. (Supp.'g S.M.F. ¶ 124.) While it is undisputed that Fitzpatrick and Goodwin discussed the position to some extent, the parties dispute how and why the position was created, what role Goodwin played in its creation, and whether Fitzpatrick promised the position to Goodwin before the opening was posted.[8]

The application period for the new position was from August 31, 2015 to September 4, 2015, which was a shorter timeframe than for some other DOC job postings. (Supp.'g S.M.F. ¶ 125; Opp. S.M.F. ¶ 82; Reply S.M.F. ¶ 82.) Just before the application deadline closed, O'Neill called Nash and asked why she had not applied, and Nash responded that she didn't apply because she knew the job was already Goodwin's. (Opp. S.M.F. ¶¶ 86, 88.) Thereafter, Nash applied. (Opp. S.M.F. ¶ 95.) A panel of interviewers was created consisting of Breton, O'Neill, Thornell, and Rodney Bouffard. (Supp.'g S.M.F. ¶¶ 126-27.) Fitzpatrick never communicated to the panel members that he favored any candidate. (Supp.'g S.M.F. ¶ 145.) Susan Gagnon, Nash, Goodwin, and Larry Austin, applied for the new director position, each met the minimum requirements, and each was interviewed on September 10, 2015. (Supp.'g S.M.F. ¶¶ 129-30.)

Gagnon was the interview panel's unanimous top choice. (Supp.'g S.M.F. ¶131.) She was well prepared for the interview, presented concrete ideas, explained what she wished to accomplish in the role, and gave a timeline of when she believed she could accomplish those goals. (Supp.'g

---

[8] The Court does not accept Supp.'g S.M.F. ¶¶ 121-22. Genuine disputes abound.

8

S.M.F. ¶ 131.) Breton informed Fitzpatrick of the panel selection, but did not indicate to him how the other applicants had performed in their interviews.[9, 10] (Supp.'g S.M.F. ¶ 136.)

A major point of contention on the failure to promote aspect of this case is whether Gagnon was offered the position of Director of Adult Community Corrections. Fitzpatrick held a meeting with Gagnon which Breton attended. (Supp.'g S.M.F. ¶ 139.) Fitzpatrick met with Gagnon and informed her that she had been selected to fill the position, he thought she was talented, and that the interview committee was very impressed with her. (Supp.'g S.M.F. ¶ 139.) Fitzpatrick also said there was a rumor that she did not want to work for him and he wanted to "put that on the table." (Supp.'g S.M.F. ¶ 139.) Plaintiff objects and denies Supp.'g S.M.F. ¶ 139. Plaintiff relies on her own affidavit and the affidavit of Brann to controvert Fitzpatrick and Breton's assertion that the position was offered to Gagnon. However, neither Nash nor Brann have personal knowledge as to what happened at the meeting between Fitzpatrick and Gagnon.[11] *See Spickler v. Greenberg*, 586 A.2d 1232, 1234 (Me. 1991) ("An opposing affidavit must . . . show affirmatively that the affiant has personal knowledge of matters asserted, and conclusory assertions will not substitute for this showing.") (internal citations omitted) At most, the Nash and Brann affidavits show only that Gagnon may have told others that she was not given the job. Plaintiff did not produce evidence from Gagnon. The only admissible testimony on this issue comes from

---

[9] Plaintiff objects to Supp.'g S.M.F. ¶¶ 136-38 on hearsay grounds. Defendant argues that the statements are not hearsay, but even if it were, they are not being offered to show the truth of the matter asserted. Supp.'g S.M.F. ¶¶ 136-38 are admitted. ¶¶ 136 and 138 are admitted for the truth of the matter asserted. ¶ 137 is admitted, but not for the truth of the matter asserted.

[10] In her affidavit, Nash asserts that Breton has a character for untruthfulness; however, this assertion is not a "statement of material fact" within the meaning of M.R. Civ. P. 56(h)(2) and the Court does not judge credibility on a Motion for Summary Judgment.

[11] Supp.'g S.M.F. ¶ 136 is not hearsay.

Fitzpatrick and Breton, and they both state that Gagnon was offered the position.[12] (Supp.'g S.M.F. ¶ 139.) Plaintiff did not properly controvert Supp.'g S.M.F. ¶ 139 and it is admitted.

Gagnon acknowledged that the rumor Fitzpatrick "put on the table" was true in that she had said that she did not want to work for Fitzpatrick. (Supp.'g S.M.F. ¶ 140.) She ultimately withdrew her candidacy for the Director position though Fitzpatrick did not ask her to do that.[13] (Supp.'g S.M.F. ¶ 140.)

The panel's second choice was Goodwin. (Supp.'g S.M.F. ¶ 131.) Goodwin was also well prepared for the interview and presented an impressive plan for what he envisioned doing in the position. (Supp.'g S.M.F. ¶ 131.) Goodwin was offered the position. (Supp.'g S.M.F. ¶ 142.) Fitzpatrick did not review Nash's candidacy as compared to Goodwin's, rather he just went with the recommendations of the interview panel. (Supp.'g S.M.F. ¶ 144.) The remaining candidates were informed that they had not been selected. (Supp.'g S.M.F. ¶ 143.)

Nash had more education and more experience at the DOC than Goodwin. (Opp. S.M.F. ¶¶ 119, 122.) Nash believed she was well prepared for her interview, and that during the interview she provided details about improvements to corrections, budgeting, etc., and that she spoke passionately about her vision for Adult Community Corrections. (Opp. S.M.F. ¶¶ 97, 99-111.) However, the interview panel did not agree with Nash's assessment. (Supp.'g S.M.F. ¶ 132). The interviewers felt as though they had to pull information from her during the interview. (Supp.'g S.M.F. ¶ 132). The panel believed Nash gave short answers that did not demonstrate detail or thought. (Supp.'g S.M.F. ¶ 132). The interview panel unanimously found that neither Nash nor

---

[12] Nash argues that a negative inference should be drawn from the fact that Gagnon, who is still employed by the DOC, did not testify for the Defendants that she was offered the position. The Court declines Nash's invitation to draw an inference in this regard. With the admissible evidence offered by the Defendants, the Defendants did not need to produce an Affidavit from Gagnon to satisfy their burden.

[13] Similarly, Nash objects to Supp.'g S.M.F. ¶ 140. Supp.'g S.M.F. ¶ 140 is admitted for the reasons set forth above.

Austin performed well enough for the panel to have considered offering the position to either Nash or Austin, that the opening should be reposted before it was offered to either Nash or Austin, and based on the interviews the panel questioned Nash and Austin's suitability for the position. (Supp.'g S.M.F. ¶¶ 132-33.) *Nash has no reason to believe that she was treated any differently in her interview than the other candidates.* (Supp.'g S.M.F. ¶ 134.) *Gender had nothing to do with how the candidates were ranked by the panel.* (Supp.'g S.M.F. ¶ 135.)

On September 15, 2015, after Nash was informed she was not selected for the Director position, she filled out an intake form on the Maine Human Right's Commission's ("MHRC") website alleging gender discrimination. (Supp.'g S.M.F. ¶ 146; Opp. S.M.F. ¶ 125.) Nash told Laurie Hayden that she had contacted MHRC about being discriminated against. (Supp.'g S.M.F. ¶ 148; Opp. S.M.F. ¶ 126.) Hayden told her supervisor, Gamage, that Nash had or was going to file a complaint of discrimination with the MHRC. (Opp. S.M.F. ¶ 127; Reply S.M.F. ¶ 149.) Nash's MHRC paperwork was not completed until July 8, 2016. (Supp.'g S.M.F. ¶ 147.)

Nash did not personally tell Goodwin or Fitzpatrick about her contact with the MHRC. (Supp.'g S.M.F. ¶ 152.) On September 16, 2015, O'Neill contacted Nash. He indicated he had heard about the MHRC complaint and Nash confirmed she had contacted MHRC. (Opp. S.M.F. ¶¶ 130-31.) O'Neill told Nash that she shouldn't have done that and that she should have talked with "us" first.[14] (Opp. S.M.F. ¶ 130.) O'Neill testified he does not recall the conversation with Nash, nor does he remember telling Fitzpatrick anything about Nash contacting the MHRC. (Reply S.M.F. ¶¶ 130-31.) Fitzpatrick does not recall when he learned about the communication but

---

[14] Defendants did not dispute that O'Neill was Fitzpatrick's friend and that Fitzpatrick had appointed O'Neill as an Associate Commissioner. (Opp. S.M.F. ¶ 153.)

11

believes it was not until after Nash was terminated.[15] (Supp.'g S.M.F. ¶ 153.) However, it was the practice of leaders in the DOC to tell the Commissioner right away if anyone became aware of any situation that could implicate negative public relations or damaging attention in the media.[16] (Opp. S.M.F. ¶ 132.) Leaders in the DOC were instructed to report such information up the chain of command as soon as possible. (Opp. S.M.F. ¶ 133.) Viewing the evidence in the light most favorable to the plaintiff, it is reasonable to infer that once leaders in the DOC knew of Nash's contact with the MHRC, they reported the information to other leaders in the DOC as they were instructed to do, and that Fitzpatrick was informed shortly after Nash's contact with the MHRC. Opp. S.M.F. ¶¶ 132-33 are admitted. For purposes of summary judgment, the Court accepts that Nash has raised a genuine issue of material fact that Fitzpatrick knew about Nash's contact with the MHRC on or shortly after September 15, 2015.

c. Management Review

After receiving the results of the Climate Survey, Fitzpatrick consulted with HR and decided to conduct a "management review" in Region 1. (Supp.'g S.M.F. ¶¶ 54, 57; Opp. S.M.F. ¶ 152.) Sometime before October 26, 2015, Kathleen Carnes was hired as outside management to conduct the review.[17] (Supp.'g S.M.F. ¶¶ 54, 57; Opp. S.M.F. ¶ 152.) Carnes

---

[15] Nash denies Supp.'g S.M.F. ¶ 153 and cites her own affidavit regarding leaders in the DOC being trained to share that sort of information with the commissioner as soon as possible. As a leader within the DOC, Nash is competent to testify on the matter. This evidence leads to the reasonable inference that O'Neill or others told Fitzpatrick about that contact shortly after he/they learned of it. For purposes of summary judgment, and taking the evidence in the light most favorable to the Nash, the Court accepts that Fitzpatrick knew about the communication with MHRA prior to the initiation of the management review.

[16] Defendants object to Opp. S.M.F. ¶¶ 132-33 arguing that Nash and Wright do not have personal knowledge of the practice of all leaders in the DOC. As stated above, as an RCA, Nash can testify as to what leaders in the DOC were instructed to do with information that might be embarrassing to the DOC.

[17] There is a dispute regarding who suggested initiating the outside management review. Defendants claim HR suggested it citing Fitzpatrick deposition while Nash argues it was Fitzpatrick who instructed HR citing Gamage deposition excerpts. Regardless, Fitzpatrick made the final call.

12

had performed reviews of other state agencies, but she had never worked with Fitzpatrick. (Supp.'g S.M.F. ¶ 55.) Fitzpatrick met with Carnes to ensure she was qualified but did not instruct her on how to conduct the review because he wanted her to do the management review in the way she felt was objective and professional. (Supp.'g S.M.F. ¶¶ 57-58.) The scope of Carnes' work was to investigate the results of the climate survey and to report subjective impressions learned from interviewees about concerns within Region 1. (Supp.'g S.M.F. ¶ 60.) There was no discussion of pursuing a termination or looking for reasons to terminate an employee. (Supp.'g S.M.F. ¶ 59.)

Carnes interviewed 36 employees (7 of whom were directly supervised by Nash) and asked every interviewee the same questions: what they liked about their work; did not like; and what they would like to see improve. (Opp. S.M.F. ¶¶ 155, 163; Reply S.M.F. ¶ 163.) She issued a report describing her findings.[18] (Supp.'g S.M.F. ¶¶ 63-71.) Carnes reported a majority of the staff interviewed characterized Nash and Wright's behavior in negative terms, that Nash and Wright were the most problematic members of management, Nash was ineffective in addressing Wright's behavior, and the issues in Region 1 had been known for years. (Supp.'g S.M.F. ¶ 63, 66-68.) Interviewees described the general environment in Region 1 for example, as "hostile, retaliatory, toxic, and a culture of intimidation where blame and fear are paramount." (Supp.'g S.M.F. ¶ 64.) The most noted behavior was yelling and screaming by Nash and Wright. (Supp.'g S.M.F. ¶ 64.) Some of the people interviewed by Carnes suggested that the DOC provide management training to Nash and the RCMs. (Opp. S.M.F. ¶ 160.) Carnes observed, among other things, a "need to

---

[18] Nash objected to the contents of the report on hearsay grounds. Defendants argued the report is not being used for the truth of the matter asserted but to establish what information was presented and considered before the decision was made to initiate a formal investigation. Objection overruled.

address the misuse of power and the lack of accountability on the part of Regional management was evident." (Supp.'g S.M.F. ¶ 71.)

Nash admits she has no reason to believe Carnes was biased against her because of her gender, or that the results of the investigation were dictated in advance, or that Carnes was engaged with the specific intention of finding a way to get Nash fired. (Supp.'g S.M.F. ¶ 73.) No gender bias was expressed by the interviewees to Carnes. (Supp.'g S.M.F. ¶ 67.)

It does not appear that Goodwin or the DOC provided Nash with any feedback, guidance, or training following the Climate Survey or the Management review. (Opp. S.M.F. ¶ 196.)


d. Shippee Investigation

Upon receipt of the Carnes report, Fitzpatrick consulted with HR and Breton about next steps. (Supp.'g S.M.F. ¶¶ 74-75; Opp. S.M.F. ¶ 166.) Goodwin, Nash's supervisor, was not made aware of the issues regarding Nash and he did not have input into the process against her. (Opp. S.M.F. ¶ 154.) Fitzpatrick did not ask Goodwin anything about Nash's performance in connection with placing Nash under investigation. (Opp. S.M.F. ¶ 167.) Fitzpatrick authorized further investigation.[19] (Reply S.M.F. ¶ 76.) Gamage and Breton coordinated with Laurel Shippee to conduct the investigation of Nash and Wright. (Supp.'g S.M.F. ¶ 79.) Shippee works in the Office of Employee Relations within the State of Maine's Bureau of Human Resources and her position involves addressing EEO issues and employee relations. (Supp.'g S.M.F. ¶ 80.) Shippee drafted

---

[19] The parties again disagree over who initially recommended a formal review, but it is undisputed that Fitzpatrick authorized the investigation and human resources worked with Breton to pursue it. (Supp.'g S.M.F. ¶ 76; Opp. S.M.F ¶ 76.) Regardless, Fitzpatrick was the final decisionmaker.

the notice of investigation letters based on her review of the climate survey and management review report.[20] (Supp.'g S.M.F. ¶¶ 81, 83-85.)

Shippee and her assistant Kristine Albert, investigated three allegations:

(1) Nash created pervasive atmosphere of fear, intimidation, and disrespect for employees under her supervision;
(2) Nash allowed a subordinate employee to create an atmosphere of fear, intimidation, and disrespect for employees under his supervision and failed to take appropriate disciplinary action to correct his behavior; and
(3) Nash failed to comply with DOC policies with which she did not agree.

(Supp.'g S.M.F. ¶¶ 88-90.) On December 8, 2015, Nash and Wright were removed from their positions and temporarily reassigned to the Maine Correctional Center during the investigation. (Supp.'g S.M.F. ¶¶ 87-88; Opp. S.M.F. ¶¶ 170-72.)

Shippee interviewed between 35 and 37 employees, including Nash and Wright, and reviewed Nash's employee evaluations from 2007 through 2015.[21] (Supp.'g S.M.F. ¶ 92; Opp. S.M.F. ¶¶ 178-79.)

Shippee's management review included interviewing people who were no longer employed by the DOC. (Opp. S.M.F. ¶ 174.) These former probation officers had reason to dislike Nash.[22] (Opp. S.M.F. ¶ 174.) It is unknown why these people were interviewed or who suggested they be interviewed. Given the framing of the allegations, it does not appear that the management review attempted to determine whether Nash's performance had improved over time, and this may

---

[20] Nash objected to the Supp.'g S.M.F. on grounds that it was not supported by the deposition testimony because Shippee "expressed doubt in her recollection." Based on the Court's review of the transcript, Shippee appears to be certain that she drafted the notice but expressed doubt at the time of her deposition regarding any specific examples of fear and intimidation created by Nash. *See* Def. Ex. 10 8:13-9:22.

[21] There is some dispute regarding whether Fitzpatrick participated in formulating the allegations to be investigated. Ultimately, who drafted the allegations is not material to the Court's analysis. Fitzpatrick was responsible for the allegations being drafted.

[22] Shippee did not give weight to information provided by employees who she found were biased. (Reply S.M.F. ¶ 174.) However, it is unknown whether Shippee found these particular former employees to be biased.

be important given Nash's performance reviews that suggested that she had made significant improvements in her interpersonal skills. (Supp.'g S.M.F. ¶¶ 88-90.) Shippee did not ask Nash if she would like any former DOC employees to be interviewed. (Opp. S.M.F. ¶ 176.)

Nash was interviewed on February 16, 2016 with her attorney present. (Supp.'g S.M.F. ¶ 93.) During the interview Nash advocated for herself and highlighted her value to the DOC. (Opp. S.M.F. ¶¶ 190-91.) Nash requested and was given the opportunity to submit additional documents for review. (Supp.'g S.M.F. ¶ 94.) On March 10, 2016, Nash provided Shippee with over 100 pages of examples of her positive leadership skills. (Opp. S.M.F. ¶ 192.)

Shippee wrote a report and found that each of the allegations had been substantiated.[23] (Supp.'g S.M.F. ¶¶ 95-97.) Shippee noted several negative comments from interviewees regarding Nash and Wright's behavior. (Supp.'g S.M.F. ¶ 96.) Such as "Lisa screams at employees in front of clients and other employees" and there had been an "ongoing pattern of intimidation; no one speaks up at staff meetings—if you upset Lisa you are going to pay. . . not a healthy environment" and "Lisa would yell in staff meetings—I've been shocked at how she talks to people" (Supp.'g S.M.F. ¶ 96.) Her leadership style was described by one as "my way or the highway" and "governance of fear." (Supp.'g S.M.F. ¶ 96.) On the other hand, some of Nash's direct reports indicated they had no issue with Nash. (Opp. S.M.F. ¶¶ 185-86; Reply S.M.F. ¶ 185.) Another person said Nash is a good person, good head, but did not have people skills and employees are intimidated. (Supp.'g S.M.F. ¶ 96.) In the "Discussion" section of her report, Shippee stated that "[s]o many of the witnesses talked about Ms. Nash's knowledge, passion and good heart while at the same time stressing that she had no ability to manage people and no understanding of her

---

[23] Nash objects to all statements of fact related to the findings of the Shippee Report (Supp.'g S.M.F. ¶¶ 95-98) on hearsay grounds. Defendants argue the findings are being offered for non-hearsay purposes to show the state of mind of the recipient (DOC/Fitzpatrick) and to show the cause of DOC/Fitzpatrick's subsequent actions taken based on review of the report. Objection overruled.

16

impact on the employees she supervised." (Supp.'g S.M.F. ¶ 97.) Shippee found Nash to be "engaging and forthright." (Supp.'g S.M.F. ¶ 97.) Shippee's report also included some of her own observations of Nash such as that "[a]lthough her perception of the work environment and her own behavior was 180 degrees from what was reported by staff, investigators believe she was honestly reporting her perceptions." (Supp.'g S.M.F. ¶ 97.) Shippee also reported that Nash is passionate, loud, and acts before thinking. (Supp.'g S.M.F. ¶ 97.) Shippee noted Nash failed to appreciate the power dynamic between herself as a supervisor and other employees. (Supp.'g S.M.F. ¶ 97.) Finally, Shippee reported that "[a]s investigators, we have experience investigating supervisors who are bullies and mean spirited toward employees. We do not put Ms. Nash in this category." (Supp.'g S.M.F. ¶ 97.)

Neither Shippee nor Albert were biased against Nash because of her gender, nor were they instructed to ensure Nash got fired. (Supp.'g S.M.F. ¶ 99.)

Shippee sent a copy of her report to Fitzpatrick before she received Nash's documents. (Opp. S.M.F. ¶ 193). Additionally, on March 3, 2015, the first copy of the report was also sent by Gamage to Fitzpatrick's assistant and stated that Gamage knew Fitzpatrick was "anxious" to read it. (Opp. S.M.F. ¶¶ 193-94.) On March 16, 2016, the "final" copy of the report was emailed to Fitzpatrick. (Opp. S.M.F. ¶ 194; Reply S.M.F. ¶ 194.) Shippee did not communicate with Fitzpatrick during this investigation, other than sending him the first report. (Supp.'g S.M.F. ¶ 91; Opp. S.M.F. ¶ 193.)

After receiving Shippee's Report, Fitzpatrick met with HR and Deputy Commissioner Breton. (Supp.'g S.M.F. ¶ 105). Based on the investigation, Fitzpatrick determined that termination of both Nash and Wright was warranted. (Supp.'g S.M.F. ¶ 106.) Fitzpatrick told Goodwin he was terminating Nash's employment, and Goodwin did not ask why. (Opp. S.M.F. ¶

17

210.) On March 17, 2016, Goodwin signed a letter recommending that Nash's employment be terminated, which Fitzpatrick, through HR, directed him to do. (Opp. S.M.F. ¶¶ 212-13.)

At the time, the DOC had a progressive discipline policy in place. (Opp. S.M.F. ¶ 197.) A "performance enhancement plan" was discussed for Nash and Wright but was ruled out because Fitzpatrick believed that neither Nash nor Wright acknowledged their role in the problem (Supp.'g S.M.F. ¶ 107.) However, there is a genuine dispute about whether Nash in fact knew about the "problem" before she received the Shippee report. (Supp.'g S.M.F. ¶ 107, Opp. S.M.F. ¶ 107.) Additionally, while Nash could have had value in a non-supervisory role, Fitzpatrick was concerned about the impact of transferring her to a different location under these circumstances. (Supp.'g S.M.F. ¶ 110.) Yet, Fitzpatrick acknowledged that Nash did not carry a disgruntled or angry attitude to the MCC after having been removed from the RCA position. (Supp.'g S.M.F. ¶ 110; Opp. S.M.F. ¶ 230.)

Nash received a copy of the Shippee Report sometime after March 10, 2016. (Opp. S.M.F. ¶ 195.) On March 17, 2016, Nash was sent the termination letter. (Supp.'g S.M.F. ¶ 111.) The letter recommending that Nash's employment be terminated, ghostwritten for Goodwin by HR, recited that Nash had created an "atmosphere of fear, intimidation and disrespect," and Goodwin signed the letter even though he did not believe that Nash had created an "atmosphere of fear, intimidation and disrespect." (Opp. S.M.F. ¶ 212.)

Nash admits that she yelled at subordinates on a "couple of occasions" and acknowledged that her demeanor, at times, could have been perceived by others as "negative and aggressive." (Supp.'g S.M.F. ¶ 103.) She has further acknowledged that she and Wright would yell or "hoot and holler at each other" and that while it was not "hateful, nasty bickering", other employees could have experienced those interactions as intimidating. (Supp.'g S.M.F. ¶¶ 101-02.)

18

On March 28, 2016, Nash attended a "Loudermill" hearing with her attorney to discuss the proposed termination and present additional information in her defense. (Supp.'g S.M.F. ¶¶ 112-15.) Fitzpatrick testified that during the Loudermill hearing he perceived that Nash did not recognize her role in the problem that existed in Region 1. (Supp.'g S.M.F. ¶ 116.) Fitzpatrick followed through with the proposed termination, for reasons that are disputed. (Supp.'g S.M.F. ¶ 117; Opp. S.M.F. ¶ 117.)

Fitzpatrick terminated Nash's employment, effective April 11, 2016. (Opp. S.M.F. ¶ 236; Supp.'g S.M.F. ¶ 118.) Nash was offered the opportunity to work in another position for a limited period of time (a few months), but she rejected that offer. (Reply S.M.F. ¶ 227.)

Allen Wright's employment was also terminated. (Supp.'g S.M.F. ¶ 119.) Although he was terminated from his RCM position, Fitzpatrick told Wright it might be possible to find another job for him within the DOC. (Opp. S.M.F. ¶¶ 199-200, 203; Reply S.M.F. ¶¶ 199-200, 203) However, Wright decided to retire from the DOC instead. (Opp. S.M.F. ¶¶ 204-05, 207.)

## II.     Summary Judgment Standard

Summary judgment is appropriate when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. *See Dyer v. DOT*, 2008 ME 106, ¶ 14, 951 A.2d 821; M.R. Civ. P. 56(c). A fact is material if it "can affect the outcome of the case" and a genuine dispute exists "when there is sufficient evidence for a fact-finder to choose between competing versions of the fact." *Lougee Conservancy v. CitiMortgage, Inc.*, 2012 ME 103, ¶ 11, 48 A.3d 774 (quotation marks omitted).

A court will view the evidence and any inferences that may be drawn from it in the light most favorable to Nash, as the nonmoving party. *See Cookson v. Brewer Sch. Dep't*, 2009 ME 57,

19

¶ 11, 974 A.2d 276. A court will "disregard conclusory allegations, improbable inferences, and unsupported speculation in determining whether a genuine factual dispute exists." *Cherkaoui v. City of Quincy*, 877 F.3d 14, 24 (1st Cir. 2017) (internal quotations omitted). Even if one party's version of the facts appears more credible and persuasive to the court, any genuine factual dispute must be resolved through fact-finding, regardless of the nonmoving party's likelihood of success. *Cookson*, 2009 ME 57, ¶ 12, 974 A.2d 276. "To survive a defendant's motion for summary judgment, the plaintiff must establish a prima facie case for each element of her cause of action." *Doyle v. Dep't of Human Servs.*, 2003 ME 61, ¶ 9, 824 A.2d 48.

## III. DOC's and Fitzpatrick's Motion for Summary Judgment

### a. Failure to Promote Based on Sex

Count I of Nash's Complaint alleges that the DOC and Fitzgerald discriminated against her in violation of the Maine Human Rights Act and Title VII as well as making other claims by failing to promote her to the position of Director of Adult Community Corrections ("DACC") because of her sex. The Defendants argue that they are entitled to summary judgment because there is no evidence to suggest that the decision not to promote Nash was based on her sex.

Pursuant to the MHRA and Title VII of the Civil Rights Act, it is unlawful employment discrimination for any employer to fail or refuse to hire or otherwise discriminate against an applicant because of the employee's sex. 5 M.R.S. § 4572 (2021); 42 U.S.C. § 2000e-2(a) (2022). Maine courts often look to federal precedent when interpreting the MHRA because the language "generally tracks federal anti-discrimination statutes." *Doyle*, 2003 ME 61, ¶ 14 n.7, 824 A.2d 48 (quoting *Winston v. Maine Tech. Coll. Sys.*, 631 A.2d 70, 74-75 (Me. 1993)).

A Title VII and MHRA claim may be proven by direct evidence or circumstantial evidence. *Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 53 (1st Cir. 2000). When a

20

plaintiff has not provided any direct evidence of discrimination, the three-step burden shifting framework established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, applies. *See McDonnell Douglas Corp*, 411 U.S. 792 (1973); *Doyle*, 2003 ME 61, ¶ 14, 824 A.2d 48; *see also Carnicella v. Mercy Hosp.*, 2017 ME 161, ¶ 16, 168 A.3d 768 (the three-step burden shifting analysis is ordinarily used in employment discrimination at the summary judgment stage). The plaintiff bears the initial burden to set forth a prima facie case of discrimination related to a failure to promote and must show:

(1) the employee is a member of a protected class;
(2) the employee applied for and was qualified for the job that the employer was seeking to fill;
(3) the employee was not hired for the job; and
(4) the job was later filled by a person who was not in the protected class.

*Cookson*, 2009 ME 57, ¶ 14, 974 A.2d 276 (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993); *McDonnell Douglas Corp.*, 411 U.S. 792). The burden to establish a prima facie case of disparate treatment is not onerous. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). "If the employee makes this showing, a presumption of illegal discrimination is established, and the burden shifts to the employer to produce evidence that the adverse employment action was taken for a legitimate, nondiscriminatory reason." *Cookson*, 2009 ME 57, ¶ 14, 974 A.2d 276. To satisfy its burden, "the employer need only produce admissible evidence which would allow the trier of fact to rationally conclude that the employment decision had not been motivated by discriminatory animus." *Maine Human Rights Comm'n v. Dep't of Corr.*, 474 A.2d 860, 867 (Me. 1984) (quoting *Burdine*, 450 U.S. at 257). The employee must then "demonstrate that the reason asserted by the employer was a pretext and that the true reason was illegal discrimination." *Cookson*, 2009 ME 57, ¶ 14, 974 A.2d 276. Once the employer has articulated a nondiscriminatory reason, "the presumption of discrimination drops out of the picture,

21

the *McDonnell Douglas* framework with its presumptions and burdens disappears, and the sole remaining issue is of discrimination vel non." *Zapata-Matos v. Reckitt & Colman, Inc.*, 277 F.3d 40, 45 (1st Cir. 2002) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000)). The burden of persuasion remains with the plaintiff. *Burdine*, 450 U.S. at 256.

To show pretext, a plaintiff must "proffer specific facts that would enable a reasonable factfinder to conclude that the employer's reason for termination was a sham intended to cover up the employer's true motive." *Cherkaoui*, 877 F.3d at 25 (quotation marks omitted). The employee may also point out "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons" such that a factfinder could "infer that the employer did not act for the asserted non-discriminatory reasons." *Santiago-Ramos*, 217 F.3d at 56. A plaintiff's assertion of discriminatory animus will not survive summary judgment on "conclusory allegations, improbable inferences, and unsupported speculation." *Cookson* 2009 ME 57, ¶ 22, 974 A.2d 276.

When evaluating evidence in terms of pretext, there is no "mechanical formula" and "whether an employee has generated a [genuine dispute of material] fact regarding an employer's motivation or intent is one heavily dependent on the individual facts before the court." *Cookson*, 2009 ME 57, ¶ 21, 974 A.2d 276. At the summary judgment stage, "the question is whether plaintiff has produced sufficient evidence that [she] was discriminated against . . . to raise a genuine issue of material fact." *Zapata-Matos*, 277 F.3d at 45.

When making hiring decisions, an "employer has discretion to choose among equally qualified candidates, provided the decision is not based upon unlawful criteria." *Burdine*, 450 U.S. at 259. The First Circuit has determined an employer "may hire solely based on candidates' interview scores and that 'better interview scores' may reflect an individual's superior

qualifications." *Henderson v. Massachusetts Bay Transp. Auth.*, 977 F.3d 20, 23 (1st Cir. 2020). Employee "[q]ualifications are notoriously hard to judge and, in a disparate treatment case, more must be shown than the employer made an unwise personnel decision." *Rathbun v. Autozone, Inc.*, 361 F.3d 62, 74 (1st Cir. 2004). Courts reviewing employment discrimination cases "do not act as super personnel departments substituting their judicial judgment for the business judgments of employers." *Hall v. Mid-State Mach. Prods.*, 895 F. Supp. 2d. 243, 275 (D. Me. 2012).

Here, Nash produced evidence that as a female, she is a member of a protected class; she met the initial qualifications for the Director position; she applied for the promotion; was not hired; and the promotion was given to a male coworker. Therefore, she has established a prima facie case of discrimination.

Thus, the burden shifts to the Defendants to articulate a legitimate, non-discriminatory reason for not hiring Nash for the new director position. The Defendants have clearly met their burden by offering a substantial amount of evidence demonstrating that Nash was not chosen for the promotion largely based on her performance during her interview compared to Gagnon and Goodwin. Four people (two men and two women) applied for the position. All four applicants met the basic requirements and all four were interviewed by the panel. *Nash has conceded that the interview panel was not biased against any candidate because of gender.* The panel unanimously determined Gagnon and Goodwin performed well at their interviews and were the most qualified candidates. The panel unanimously recommended the job be offered to Gagnon. Fitzpatrick offered the position to Gagnon. (Supp.'g S.M.F. ¶ 139.) While the position was first offered to Gagnon, she did not fill the position. The panel's second choice was Goodwin. The panel also unanimously determined that neither Nash nor Austin performed well enough in their interviews to have been considered for the position, so much so that the panel questioned their basic suitability

23

for the position. The panel would have recommended that the position be reposted if Goodwin did not accept it. Fitzpatrick did not sit on the panel, evaluate any candidate, or express a preference for any candidate to any panel member. The Court is satisfied that the Defendants have met their burden to articulate a non-discriminatory reason for not promoting Nash to the new director position.

The burden shifts back to Nash to demonstrate a genuine dispute of material fact exists as to whether her interview performance was pretext for the Defendants' alleged discriminatory animus. In an effort to carry this burden, Nash argues she was a more qualified, experienced candidate than Goodwin. Nash also argues she was treated differently than Goodwin because Fitzpatrick had a conversation with Goodwin and solicited feedback regarding a new director position before it was created. After that conversation, Goodwin made comments to co-workers that Fitzpatrick had already offered him the job and later testified he lied to his coworkers hoping to dissuade others from applying for the position. Plaintiff points out the position was posted for a shorter period of time than other positions and that it was unusual for that type of position to not require a college degree. The Court has carefully considered each of these contentions.

The only evidence provided to rebut the panel's assessment of Nash's interview and independent panel interview process is Nash's subjective belief that her interview was "wonderful" and her subjective belief that she was a superior candidate. *Even more detrimental to her opposition, is the fact that Nash has conceded that the interview panel was not biased against her.* There is no evidence that the shortened time period to apply for the position was gender based— two women and two men applied for the position.

An employer's decision to hire or promote, even if unwise, will not be second guessed by a court so long as it was not based on an unlawful consideration. Here, Nash has not provided

24

evidence of unlawful considerations on the part of the panel except the conclusory allegation that it was based on her sex. Despite the arguments raised by Nash, the position was first offered to a woman. *Cf. Pabón v. Vilsack*, CV No. 13-1147 (MEL), 2015 U.S. Dist. LEXIS 24356, at *16 (D.P.R. 2016) ("In light of defendant's unrebutted evidence that a woman was selected for the position in favor of plaintiff, who is female, there is no genuine issue of material fact regarding whether plaintiff's non-selection for the [job] was motivated by her gender."). Moreover, after the interviews were conducted, the interview panel no longer considered Nash a qualified candidate for the job. At that point, she was no longer in the running for the position, and she could not have been discriminated against with respect to not being offered the promotion. *Cf. Pabón*, 2015 U.S. Dist. LEXIS 24356, at *13 (noting that a claim of pretext would fail based on evidence that plaintiff was interviewed and ranked by a panel and her name was not sent to the decision maker).

While Nash has generated some disputes of fact, the Court finds that Nash has failed to generate a genuine issue of material fact that the reasons articulated for Nash's not being hired were pretext for discriminatory animus.

The Defendants' motion for summary judgment as to all claims based on the failure to promote is granted.

#### b. Fitzpatrick Individually on MHRA Claims

Nash has also brought claims against Defendant Fitzpatrick individually for discrimination and retaliation pursuant to the MHRA. Fitzpatrick argues as an individual supervisor, he is entitled to summary judgment on Counts I and II to the extent those claims are premised on a violation of the MHRA because there is no basis for individual supervisor liability. The Law Court addressed the issue of whether the MHRA provided individual supervisor liability in *Fuhrmann v. Staples*

25

*the Office Superstore East, Inc.*, 2012 ME 135, 58 A.3d 1083. The Court determined an individual

supervisor could not be held liable under 5 M.R.S. § 4572(1)(A) and explained:

> The MHRA's express incorporation of vicarious liability and its employer-specific remedies do not signal any intent to hold individual supervisors liable for employment discrimination. If the Legislature had intended to create individual supervisor liability it would have done so explicitly in much clearer terms. In the absence of any clear indication to that effect, we will not undermine the purpose of these statutes by reading them to provide for individual supervisor liability.

*Fuhrmann*, 2012 ME 135, ¶ 34, 58 A.3d 1083. Though that decision did not explicitly consider

section 4633, it studied "the statutory scheme as a whole and its underlying policy" to compel the

broad determination that MHRA does not provide for individual liability. *Fuhrmann*, 2012 ME

135, ¶ 35, 58 A.3d 1083. This Court is satisfied that under *Fuhrmann*, Fitzpatrick is not subject to

individual supervisor liability pursuant to the MHRA.[24] Summary judgment therefore is

appropriate as to Counts 1 and 2 to the extent they apply to Fitzpatrick individually and are brought

under the MHRA.

---

[24] Other courts have interpreted the holding in *Fuhrmann* "as foreclosing any recourse to individual liability in the employment context under the Act" including section 4633 of the MHRA. *Charette v. St. John Valley Soil & Water Conservation Dist.*, No. 1:17-cv-35-GZS, 2017 U.S. Dist. LEXIS 94433, at *34-35 (D. Me. June 20, 2017) (listing cases); *see also Gallagher v. Penobscot Cmty. Healthcare*, No. CV-16-54, 2017 Me. Super. LEXIS 215 (Mar. 21, 2017); *Furrow v. Hannaford Bros. Co.*, PENSC-CV-22-0008 (Me. Super. Ct., Pen. Cnty., May 16, 2022).

### c. All Other Claims

With respect to the discharge,[25] retaliation,[26] and other claims,[27] Nash argues that she has produced sufficient evidence to defeat Defendants' Motion for Summary Judgment.

Nash presented evidence of the experiences of other female employees in the DOC under Fitzpatrick. Both Brann and Beale provided affidavits setting forth their employment experiences with the DOC and Fitzpatrick and suggested that such treatment was due to their gender. In particular, Brann believed that Fitzpatrick excluded her from leadership meetings and made it more difficult for her to do her job. Brann complained to human resources about Fitzpatrick treating her differently than male leaders. When Brann approached Fitzpatrick to discuss her perception that he was excluding and ignoring her, he told her she was being "too emotional" and that "everything was fine." (Opp. S.M.F. ¶ 53) Fitzpatrick removed Brann's leadership over the minimum-security facilities. (Opp. S.M.F. ¶ 38.) Brann eventually left the Maine DOC. With respect to Beale, she

---

[25] The MHRA and Title VII make it "an unlawful employment practice for an employer to . . . discharge any individual . . . because of such individual's . . . sex." 5 M.R.S. § 4572 (2021); § 42 U.S.C. § 2000e-2(a) (2022). Because there is no direct evidence of discrimination, the burden shifting framework applies to Plaintiff's unlawful termination claim. With respect to the Equal Protection argument, "some evidence of actual disparate treatment is a "threshold requirement" of a valid equal protection claim." *Ayala-Sepúlveda v. Municipality of San German*, 671 F.3d 24, 32 (1st Cir. 2012). For purposes of summary judgment, Nash has produced sufficient evidence that: 1) she is a member of a protected class; 2) she performed her job satisfactorily; 3) her employer took adverse employment action against her; and 4) there was a need for her duties to continue to be performed after the termination of her employment. Furthermore, Defendants have articulated a nondiscriminatory reason for terminating Nash's employment.

[26] The MHRA and Title VII prohibit retaliation "against any individual because that individual has opposed any act or practice that is unlawful under [MHRA] or because that individual made a charge, testified, assisted, or participated in any manner in an investigation, proceedings or hearing under the [MHRA]." 5 M.R.S. § 4633(1) (2021); *see also* 42 U.S.C. § 2000e-3(a) (2022). The burden shifting analysis also applies to the retaliation claim. "Claims of retaliation for the exercise of First Amendment rights are cognizable under § 1983." *Powell v. Alexander*, 391 F.3d 1, 16 (1st Cir. 2004). "[T]he First amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out." *McGunigle v. City of Quincy*, 835 F.3d 192, 202 (1st Cir. 2016) (citation omitted).

[27] Nash also brings claims against Fitzpatrick pursuant to 42 U.S.C. § 1983 for violations of the Equal Protection Clause and the First Amendment. "Section 1983 provides remedies for individuals deprived of federal rights by state officials acting under color of state law." *Brandt v. Fitzpatrick*, No. 1:15-cv-461-NT, 2016 U.S. Dist. LEXIS 168075, at *11 (D. Me. Dec. 5, 2016) (citing 42 U.S.C. § 1983.) Unlike Title VII and the MHRA, which apply only to employers, section 1983 permits suit against a person in their individual capacities. *See id.* "Liability for public officials under section 1983 arises only if 'a plaintiff can establish that his or her constitutional injury resulted from the direct acts or omissions of the official, or from indirect conduct that amounts to condonation or tacit authorization.'" *Id.* at *13.

was demoted by Fitzpatrick. Her title and responsibilities changed from director of programming to assistant director of programming. Beale's responsibilities were reassigned to a male. Fitzpatrick eventually fired Beale. Plaintiff also argued that Wolford-Wessling was another woman treated differently by Fitzpatrick due to her gender. However, Wolford-Wessling did not provide an affidavit and there is no deposition testimony from her in the record. The factual assertions with respect to Wolford-Wessling are not admissible, other than merely that her role within the organization changed under Fitzpatrick.

Additionally, Fitzpatrick chose a man to monitor a particular high-profile sex offender in the place of the female who specialized in monitoring sex offenders. (Opp. S.M.F. ¶ 68.) Fitzpatrick also made a change in membership for the Portland drug court substituting Nash with a male(s) for that responsibility. (Opp. S.M.F. ¶ 69.) Chris Arbour, a male, was one of the people who Fitzpatrick named to the drug court. (Opp. S.M.F. ¶¶ 69, 183, 186.) Arbour was directly supervised by Nash and the drug court assignment was made without Nash's knowledge.[28] (Opp. S.M.F. ¶¶ 69, 183, 186.)

With respect to men at the DOC, the DOC and Fitzpatrick argue that Wright was similarly situated to Nash. (Pl. DOC's Mot. Summ. J. 18, 22, 24; Pl. Fitzpatrick's Mot. Summ. J. 13.) Accepting Fitzpatrick and DOC's position in this regard, Nash was not treated similarly to Wright.[29] (Opp. S.M.F. ¶ 203.) Fitzpatrick told Wright that it might be possible to find him another job within the DOC. (Opp. S.M.F. ¶ 204.) Nash was only given the option to work for a few additional months. (Opp. S.M.F. ¶ 227.)

---

[28] This was one of the items Nash reportedly yelled about. (Opp. S.M.F. ¶ 183.)
[29] Alternatively, in other respects, the DOC and Fitzpatrick argue that Wright and Nash were not similarly situated as Nash was Wright's supervisor. (Reply S.M.F. ¶ 227.)

The Court has also considered the evidence offered with regard to other male employees, Rodney Bouffard, Jeff Merrill, Larry Austin, and Dan Harfoush, who Nash claims Fitzpatrick treated more favorably by creating new jobs for them or giving them second chances when there was an issue with their job performance. Although they suggest it was through no fault of Bouffard, Defendants admit that Fitzpatrick moved Bouffard from the position of warden of the Maine State Prison after he was ineffective at changing the culture at the prison. (Reply S.M.F. ¶¶ 40, 237.) When Bouffard was removed from being the warden, he was promoted to be an Associate Commissioner. (Reply S.M.F. ¶¶ 40, 237.) For purposes of summary judgment, the Court accepts that there is a genuine issue of material fact whether Bouffard was given another job within the DOC after he had difficulties as warden at the prison. With respect to the treatment of other male employees, the affidavits do not demonstrate personal knowledge, the details of these males' alleged employment deficiencies, or how they were treated thereafter. Therefore, the Court does not consider the factual assertions with respect to the other men.

Nash had been employed by the DOC for over 33 years at the time of her termination. She had worked her way up through the ranks. She had engaged in efforts to improve Adult Community Corrections, took great initiative to prevent recidivism, participated in several trainings, and presented trainings both in Maine and nationally. (Opp. S.M.F. ¶¶ 5-22.) Nash had received a judicial award for her work on the Drug Court. (Opp. S.M.F. ¶ 69.) Additionally, Nash received a very positive performance evaluation in August of 2015, and her "interpersonal skills" were rated "exceeds expectations." (Opp. S.M.F. ¶¶ 215-16.) This is particularly important because her employment was terminated 7 months later due, in essence, to poor interpersonal skills. Additionally, Nash had worked to and reportedly did improve interpersonal skills over the years.

Beginning in September of 2015, Goodwin became Nash's supervisor. (Opp. S.M.F. ¶ 124.) While O'Neill told Goodwin that Fitzpatrick wanted a review of Nash done, Goodwin was not made aware of the issues regarding Nash and Goodwin did not have input into the process against her. (Opp. S.M.F. ¶ ¶ 153-54) While some of the people interviewed by Carnes suggested that the DOC provide Nash and others in region 1 with management training, it does not appear that any such training was provided. It does not appear that Goodwin provided Nash with any feedback following the Climate Survey or the Management review. (Opp. S.M.F. ¶ 196.) Fitzpatrick did not ask Goodwin anything about Nash's performance in connection with placing Nash under investigation. (Opp. S.M.F. ¶ 167.) Goodwin did not read the Shippee report, the report that the Defendants rely on as being the reason Nash was fired. (Opp. S.M.F. ¶ 211.) The letter recommending that Nash's employment be terminated, ghostwritten for Goodwin by HR, recited that Nash had created an "atmosphere of fear, intimidation and disrespect," and Goodwin signed the letter even though he did not believe that Nash had created an "atmosphere of fear, intimidation and disrespect." (Opp. S.M.F. ¶ 212.) Fitzpatrick told Goodwin he was terminating Nash's employment, and Goodwin did not ask why. (Opp. S.M.F. ¶ 210.) Goodwin signed the termination letter because Fitzpatrick, through HR, told him to do so. (Opp. S.M.F. ¶ 213.)

During the time frame in question, the DOC had a policy of progressive discipline. (Opp. S.M.F. ¶¶ 197-98.) After reading the Shippee report, Nash expressed to Fitzpatrick that she wanted the opportunity to improve her performance. (Opp. S.M.F. ¶ 198.) While Nash had demonstrated an ability to improve in the past, as noted in her various performance reviews, she was not given the opportunity to demonstrate improvement after the Carnes' review or the Shippee investigation. After her performance evaluation in August of 2015 and before March of 2016, Nash was never notified of any need for improved performance. In her last performance review, in August of 2015,

30

she was told that her interpersonal skills "exceeded expectations." Further, when Fitzpatrick and O'Neill visited Nash in August of 2015 and informed her there were issues with morale in her region, she asked for more detail so she could address the issues immediately and they refused to provide her with any specific details. (Opp. S.M.F. ¶¶ 221-24.)

One of the allegations Shippee investigated was whether Nash failed to comply with DOC policies with which Nash did not agree. While Shippee substantiated the allegation against Nash for not carrying a gun, Shippee did not know whether it was actually a violation of policy for Nash to not carry a gun.[30] (Supp.'g S.M.F. ¶¶ 88-90; Opp. S.M.F. ¶ 188.) However, Nash acknowledged the violation to Shippee. Shippee did not substantiate Nash for any other policy violations.

Nash argues that the investigative process was a pretext for firing her because of her sex. A majority of the people who Carnes interviewed did not report to Carnes that Nash needed to be removed from region 1 before there could be improvement. (Opp. S.M.F. ¶ 158) (qualified). Some interviewees suggested to Carnes that the DOC should provide Nash and others with management training.

Finally, Plaintiff argues that there were flaws with Shippee's investigation. Shippee interviewed former DOC employees, who had reason to dislike Nash. (Opp. S.M.F. ¶ 174.) It is not known who suggested Shippee interview former employees or why. Nash was not asked if she wished to have other former employees interviewed as well. Sue Weichman, a woman, was one of seven of Nash's direct reports. (Opp. S.M.F. ¶ 187.) She was not interviewed by Shippee. (Opp. S.M.F. ¶ 187.) The people Shippee interviewed were not unanimous in complaining about Nash. In the Shippee notes, of the people Nash directly supervised, one relayed complaints about Nash,

---

[30] While in Reply S.M.F. ¶ 188 Defendants state that Shippee was investigating whether Nash had visited a probationer without carrying a firearm, in Supp.'g S.M.F. ¶ 89 Defendants state that the allegation that Shippee was investigating was whether "Nash failed to comply with department policies with which she did not agree.".

31

five did not relay complaints (although 1 of these 5 said Nash raised her voice), and one direct report was not interviewed. (Opp. S.M.F. ¶¶ 186-87.) (qualified.) Furthermore, one direct report provided quite positive comments about Nash. (Opp. S.M.F. ¶ 186.) Two people who indicated that they did not have any issues with Nash were not listed in the Shippee report. (Opp. S.M.F. ¶ 185.) On March 1, 2016, Shippee sent Fitzpatrick her report. (Opp. S.M.F. ¶ 193.) This initial report was sent before Nash had submitted her documents to the investigator. (Opp. S.M.F. ¶ 193.) On March 3, 2016, HR (Gamage) also transmitted a copy of this same report to Fitzpatrick's assistant and recited that Gamage knew Fitzpatrick was "anxious" to read it. (Opp. S.M.F. ¶ 194.) On March 16, 2016, Gamage emailed a "final" copy of the report to Fitzpatrick. (Reply S.M.F. ¶ 193). Sometime after March 10, 2016, Nash received a copy of the Shippee report and this was the first time she learned what the investigation revealed about her subordinates' complaints. (Opp. S.M.F. ¶¶ 195-96; Reply S.M.F. ¶ 196.)

Nash made contact with the MHRC on September 15, 2015 reporting discrimination by Fitzpatrick. Carnes was engaged sometime before October 26, 2015 to perform the management review. (Supp.'g S.M.F. ¶ 152.) For the purpose of summary judgment, taking the evidence in the light most favorable to the Plaintiff, the Court finds that Nash has established genuine issues whether Fitzpatrick knew that Nash had contacted MHRC alleging that he had discriminated against her on or shortly after September 15, 2015. There was no significant "gap" between Nash's contact with the MHRC and the beginning of the investigative process directed by Fitzpatrick which led to the eventual termination of Nash's employment.

Altogether, as to all issues other than the issues relating to failure to promote and the claim of individual liability under the MHRA against Fitzpatrick individually, the Court finds that Nash

32

has raised multiple genuine issues of material fact. Taking the evidence in the light most favorable to the Plaintiff, the Defendants' motion for summary judgment as to the other issues is denied.

## IV. Conclusion

Considering all of the evidence taken together in the light most favorable to the Plaintiff and making all reasonable inferences in the plaintiff's favor, while it is a close call, the Motion for Summary Judgment is denied as to all claims except with respect to the failure to promote claims and the MHRA claim against Fitzpatrick individually. Ms. Nash has raised multiple questions of fact and argued reasonable inferences that may be drawn and these claims must be addressed by a jury.

The Motion for Summary Judgment is granted as to all claims related to the failure to promote and the claims for individual liability against Fitzpatrick under the MHRA. As to all other claims, the Motion for Summary Judgment is denied.

The entry is: Defendants' Motion for Summary Judgment is granted in part and denied in part.

**10/17/2022**

Date

Ann M. Murray, Justice
Maine Superior Court

ORDER/JUDGMENT ENTERED IN THE
COURT DOCKET ON: _10-18-2022_

33